ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS, INC., et al., Appellees,

v.

Hillary Rodham CLINTON, et al., Appellants.

ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS, INC., et al., Appellants,

v.

Hillary Rodham CLINTON, et al., Appellees.

Nos. 93–5086, 93–5092.

United States Court of Appeals, District of Columbia Circuit.

Argued April 30, 1993.

Decided June 22, 1993.

Mark B. Stern, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for appellants/cross-appellees Hillary Rodham Clinton, et al. With him on the briefs were J. Ramsey Johnson, U.S. Atty., Stuart E. Schiffer, Acting Asst. Atty. Gen., Robert E. Kopp, Patricia A. Millett, and Malcolm L. Stewart, Attys., U.S. Dept. of Justice, Washington, DC. Stuart M. Gerson, Atty., U.S. Dept. of Justice, Washington, DC, entered an appearance for appellants/cross-appellees.

Kent Masterson Brown, Louisville, KY, argued the cause for appellees/cross-appellants Association of American Physicians and Surgeons, Inc., et al. With him on the briefs were Frank M. Northam and Alan P. Dye, Washington, DC.

Steven R. Ross, Gen. Counsel, and Charles Tiefer, Deputy Gen. Counsel, Office of Gen. Counsel, U.S. House of Representatives, Washington, DC, filed the brief for amicus curiae Speaker and Bipartisan Leadership Group.

Ronald A. Zumbrun, Anthony T. Caso, and Robin L. Rivett, Sacramento, CA, filed the brief for amici curiae Pacific Legal Foundation and the National Taxpayers Union.

Jane E. Kirtley, J. Laurent Scharff, James E. Grossberg, Richard M. Schmidt, Jr., Allan R. Adler, Bruce W. Sanford, Henry S. Hoberman, and Whitney M. Adams, Washington, DC, filed the brief for amici curiae Reporters Committee for Freedom of the Press, et al.

Joseph Gregory Sidak, Washington, DC, filed the brief for amicus curiae J. Gregory Sidak.

Samuel B. Wallace, IV, filed the brief for amicus curiae Samuel B. Wallace, IV.

Before: SILBERMAN, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Opinion concurring in the judgment filed by Circuit Judge BUCKLEY.

SILBERMAN, Circuit Judge:

This expedited appeal presents the question whether the President's Task Force on National Health Care Reform ("Task Force") and its working group are advisory committees for purposes of the Federal Advisory Committee Act ("FACA"). If they are, we are asked to decide whether FACA unconstitutionally encroaches on the President's Article II executive powers. We hold that the Task Force is not an advisory group subject to FACA, but remand to the district court for further proceedings to determine the status of the working group.

I.

On January 25, 1993, President Clinton established the President's Task Force on National Health Care Reform. The President named his wife, Hillary Rodham Clinton, as the chairman of the Task Force, and appointed as its other members the Secretaries of the Treasury, Defense, Veterans Affairs, Health and Human Services, Labor, and Commerce Departments, the Director of the Office of Management and Budget, the chairman of the Council of Economic Advis-

ers, and three White House advisers. President Clinton charged this body with the task of "listen[ing] to all parties" and then "prepar[ing] health care reform legislation to be submitted to Congress within 100 days of our taking office." 29 WEEKLY COMP.PRES.DOC. 96 (Feb. 1, 1993).

On the same day, the President also announced the formation of an interdepartmental working group. According to the government, the working group was responsible for gathering information and developing various options on health care reform. It was composed of three types of members: (i) approximately 300 permanent federal government employees drawn from the Executive Office of the President, the federal agencies, and Congress; (ii) about 40 "special government employees" hired by the agencies and the Executive Office of the President for a limited duration; and (iii) an unknown number of "consultants" who, it is asserted, "attend working group meetings on an intermittent basis." Ira Magaziner, the senior adviser to the President for Policy Development, headed the working group and was the only member of the Task Force who attended the group's meetings.

According to the government, the working group had no contact with the President. In addition to gathering information, the working group developed alternative health care policies for use by the Task Force. But only the Task Force, it was contemplated, would directly advise and present recommendations to the President. On March 29, 1993, the Task Force held one public hearing where interested parties could present comments on health care reform. See 58 Fed.Reg. 16,264 (1993). However, the Task Force met behind closed doors at least 20 times in April and May to "formulate" and "deliberate" on its advice to the President. As the government publicly has announced, in those meetings "the Task Force reviewed materials it received from the interdepartmental working group; formulated proposals and options for health care reform; and presented those pro-

posals and options to the President." Statement of the White House Press Secretary (June 4, 1993). In accordance with its charter, the Task Force then terminated its operations on May 30.[1] All of the working group's meetings remained closed to the public.

Appellees are the Association of American Physicians and Surgeons, which represents physicians; the American Council for Health Care Reform, which represents health care consumers; and the National Legal & Policy Center, which seeks to promote ethics in government. They sought access to the Task Force's meetings under the Federal Advisory Committee Act. Pub.L. No. 92–463, 86 Stat. 770 (1972) (reproduced at 5 U.S.C.App. 1 (1988)). Their efforts were rebuffed by the Counsel to the President, who informed them that the Task Force was not an advisory committee subject to FACA.

Appellees thereupon brought suit against the Task Force in district court. They claimed that the Task Force was a FACA committee because it was chaired by Mrs. Clinton, a private citizen, and that the Task Force had violated FACA by failing to file an advisory committee charter. They further asserted that FACA permitted them to attend all of the meetings of the Task Force and of any of its subgroups. Appellees sought a temporary restraining order and a preliminary injunction halting the operation of the Task Force until it complied with FACA and allowed the public to attend its meetings. The government responded that the Task Force was exempt from FACA because all of its members—including Mrs. Clinton—were government officers and employees. The government alternatively challenged any application of FACA to the Task Force as an unconstitutional infringement on the President's executive power.

In a memorandum opinion issued on March 10, 1993, the district court granted in part appellees' motion for a preliminary injunction. The court determined that appellees had a substantial likelihood of success on the merits. Mrs. Clinton, the court held, was not an officer or employee of the federal government merely by virtue of her status as "First Lady." Therefore, the Task Force

1. The Task Force's "termination" does not render this case moot. As both parties, in anticipation of this event, agreed before oral argument, this case still presents a live controversy concerning the availability of Task Force and working group documents, which the appellees sought below pursuant to FACA.

could not qualify for an exemption from FACA as an advisory group composed solely of "full-time officers or employees" of the government. *See Association of Am. Physicians & Surgeons v. Hillary Rodham Clinton,* 813 F.Supp. 82, 89–90 (D.D.C.1993) ("Mem. Op."); *see also* 5 U.S.C.App. 2 § 3(2)(iii). The court, however, agreed with the government that FACA encroached on the President's constitutional authority to receive confidential advice for the purpose of recommending legislation. But the court thought that executive prerogatives were implicated only when the Task Force was advising the President, not when it engaged in information-gathering. The district court accordingly granted a preliminary injunction requiring the Task Force to meet all the requirements of FACA except when it met to formulate advice or recommendations for the President.

As to the working group, the district court concluded that appellees had failed to state a claim under FED.R.CIV.P. 12(b)(6) that the subordinate body was covered by FACA. Relying on *National Anti–Hunger Coalition v. Executive Committee,* 557 F.Supp. 524 (D.D.C.), *aff'd,* 711 F.2d 1071 (D.C.Cir.1983), the court held that the working group was not an advisory committee because it was engaged in fact-gathering and did not provide advice directly to the President. The court denied appellees motion for expedited discovery concerning the actions and status of the working group, but nevertheless determined that there were no issues of material fact and that it could have dismissed on summary judgment grounds as well. Mem. Op. at 89 n. 11.

The government filed this appeal on March 22, 1993. Appellees subsequently filed a cross-appeal. We have jurisdiction to review a grant of a preliminary injunction under 28 U.S.C. § 1292(a), and we expedited the appeal due to the short time frame within which the Task Force and the working group operated.

## II.

The government, as appellant and cross-appellee, and the plaintiffs below, as appellees and cross-appellants, together challenge much of the district court's ruling. The government takes issue primarily with the court's determination that Mrs. Clinton is not an "officer or employee" for purposes of section 3(2) of FACA. It is claimed that as the "First Lady," Mrs. Clinton is the functional equivalent of a government officer or employee, that the Task Force, therefore, is composed solely of full-time government officials—indeed officers drawn from among the President's closest official advisers—and that thus the Task Force is exempt from FACA. In the alternative, the government reiterates its claim that FACA cannot be applied constitutionally to the Task Force. We are urged, in that regard, to discard the distinction drawn by the district court between the information-gathering function of the Task Force and its role in advising the President. As would be expected, the government is content with the district court's ruling concerning the status of the working group, and it argues that the district court's dismissal of appellees' claim is an unappealable interlocutory order.

Appellees, on the other hand, support the district court's determination that FACA covers the Task Force because Mrs. Clinton is not an officer or employee of the federal government. However, they challenge the court's ruling as to the status of the working group, which they contend is also covered by FACA. They further maintain that applying FACA to either body raises no serious constitutional issues, and, in any event, that the district court prematurely decided the constitutional issue. Appellees also contend that the court should have permitted discovery, which would have shown more clearly the FACA status of both groups, and that a straightforward application of FACA's procedural requirements would not curtail President's constitutional powers.

We first consider the status of the Task Force and then turn to the working group issues.

## III.

Congress passed FACA in 1972 to control the growth and operation of the "numerous committees, boards, commissions, councils,

and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government." 5 U.S.C.App. 2, § 2(a). As Congress put it, FACA's purpose was: to eliminate unnecessary advisory committees; to limit the formation of new committees to the minimum number necessary; to keep the function of the committees advisory in nature; to hold the committees to uniform standards and procedures; and to keep Congress and the public informed of their activities. *See id.* § 2(b)(1)–(6). The statute orders agency heads to promulgate guidelines and regulations to govern the administration and operations of advisory committees. *See id.* § 8.

FACA places a number of restrictions on the advisory committees themselves. Before it can meet or take any action, a committee first must file a detailed charter, *see id.* § 9(c). The committee must give advance notice in the Federal Register of any meetings, *see id.* § 10(a)(2); and it must hold all meetings in public, *see id.* § 10(a)(1). Under section 10, the committee must keep detailed minutes of each meeting, *see id.* § 10(c), and make the records available—along with any reports, records, or other documents used by the committee—to the public, provided they do not fall within the exemptions of the Freedom of Information Act (FOIA), *see id.* § 10(b). Under section 5, an advisory committee established by the President or by legislation must be "fairly balanced in terms of the points of view represented," *id.* § 5(b)(2).[2] The Act also requires that precautions be taken to ensure that the advice and recommendations of the committee "will not be inappropriately influenced by the appointing authority or by any special interest." *Id.* § 5(b)(3).

█ The Act's definition of an "advisory" committee is apparently rather sweeping. Section 3 states:

> The term "advisory committee" means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof (hereinafter in this paragraph referred to as "committee"), which is ... (B) established or utilized by the President ... in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government.

*Id.* § 3(2). The government does not contend that the Task Force was not "established" or "utilized" by the President in the interest of obtaining advice or recommendations. FACA's definition contains one important proviso, however. Section 3(2)(iii) exempts "any committee which is composed wholly of full-time officers or employees of the Federal Government." And, according to the government, the Task Force was not only wholly composed of government officers, it was actually (like the Task Force we encountered in *Meyer v. Bush,* 981 F.2d 1288 (D.C.Cir.1993)) a partial, yet somewhat augmented, cabinet grouping. Thus, subjecting the Task Force to FACA would fall outside Congress' purpose of regulating the growth and use of committees composed of outsiders called in to advise government officials. Appellees would have no quarrel with the government's characterization of the Task Force, except for the description of its chairman, Mrs. Clinton. Appellees contend that she is not an officer or employee of the federal government despite her traditional and ceremonial status as "First Lady." This is not just a technicality according to appellees; she is statutorily barred from appointment as an officer because of the Anti–Nepotism Act. *See* 5 U.S.C. § 3110(b).

The district court, finding no definition of officer or employee of the federal government in FACA itself, quite reasonably turned to Title 5 of the U.S.Code to find a definition. *See* 5 U.S.C. §§ 2104 & 2105. An officer or employee according to those sections must be: (i) appointed to the civil service; (ii) engaged in the performance of a federal function; and (iii) subject to supervision by a higher elected or appointed official. As the district court held, and as appellees correctly point out, Mrs. Clinton has not been appointed to the civil service. Reading these defini-

---

2. FACA's "balanced viewpoint" requirement may not be justiciable, however, because it does not provide a standard that is susceptible of *judicial* application. *See Public Citizen v. National Advisory Comm.,* 886 F.2d 419, 426 (D.C.Cir.1989) (Silberman, J., concurring).

tions *in pari materia* with FACA would seem to suggest that the Task Force is not exempt.

Nevertheless, it is true, as the government insists, that Congress did not adopt explicitly all of Title 5's definitions in FACA. FACA is not part of Title 5, which was enacted six years before FACA's passage, *see* Pub.L. No. 89–554, 80 Stat. 378 (1966), but, instead is only temporarily housed there as an appendix. Typically, when Congress wishes to add a statute to Title 5, it amends the Title. *See, e.g.,* Government in the Sunshine Act, § 3(a), Pub.L. No. 94–409, 90 Stat. 1241 (1976); Privacy Act of 1974, Pub.L. No. 93–579, 88 Stat. 1896 (1974). It did not do so when it passed FACA, but at that time it specifically did adopt certain Title 5 definitions. For example, adjacent to the definition of an advisory committee is FACA's definition of an agency, which incorporates the definition in Title 5: " 'agency' has the same meaning as in section 551(1) of title 5, United States Code." 5 U.S.C.App. 2, § 3(3). But Congress actually deleted from the Senate version of FACA definitions of "officer" and "employee" that paralleled those of sections 2104 and 2105. *See* H.R.REP. NO. 1403, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.CODE CONG. & ADMIN.NEWS 3508, 3509. And the Code contains another definition of a federal officer which tends to support the government's position. Title 1 provides that a federal officer "includes any person authorized by law to perform the duties of the office." 1 U.S.C. § 1. That definition could cover a situation in which Congress authorizes someone who is not formally an officer (such as the President's spouse) to perform federal duties. Even if, as our concurring colleague argues, Mrs. Clinton does not occupy an "office" specifically created by Congress, she could still be regarded as an "employee."

The government would have us conclude that the traditional, if informal, status and "duties" of the President's wife as "First Lady" gives her *de facto* officer or employee status. The government invokes what it describes as "a longstanding tradition of public service" by First Ladies—including, we are told, Sarah Polk, Edith Wilson, Eleanor Roosevelt, Rosalynn Carter, and Nancy Reagan—who have acted (albeit in the background) as advisers and personal representatives of their husbands. We are not confident that this traditional perception of the President's wife, as a virtual extension of her husband, is widely held today. As this very case suggests, it may not even be a fair portrayal of Mrs. Clinton, who certainly is performing more openly than is typical of a First Lady. Indeed, in the future we may see a male presidential spouse, which could make the term "First Lady" anachronistic.

■ More persuasive, however, is the government's argument that *Congress* itself *has* recognized that the President's spouse acts as the functional equivalent of an assistant to the President. The legislative authorization to the President to pay his White House aides includes the following provision:

Assistance and services authorized pursuant to this section to the President are authorized to be provided to *the spouse of the President in connection with assistance provided by such spouse to the President in the discharge of the President's duties and responsibilities.* If the President does not have a spouse, such assistance and services may be provided for such purposes to a member of the President's family whom the President designates.

3 U.S.C. § 105(e) (emphasis added). Of course, even without section 105(e), the President presumably could draw upon his spouse for assistance. The statute's importance, rather, lies in its assistance in helping us interpret the ambiguous terms of FACA *in pari materia.*

It may well be, as appellees argue, that many in Congress had in mind "ceremonial duties," but we do not think the presidency can be so easily divided between its substantive political and ceremonial functions. In any event, section 105(e) neither limits the particular kind of "assistance" rendered to the President, nor circumscribes the types of presidential duties and responsibilities that are to be aided. We see no reason why a President could not use his or her spouse to carry out a task that the President might delegate to one of his White House aides. It is reasonable, therefore, to construe section

105(e) as treating the presidential spouse as a *de facto* officer or employee. Otherwise, if the President's spouse routinely attended, and participated in, cabinet meetings, he or she would convert an all-government group, established or used by the President, into a FACA advisory committee.

Pursuant to this section, moreover, the President's spouse is supported by a substantial staff who are undeniably full-time government officers or employees. Therefore, the President could have—as the government points out—easily designated Mrs. Clinton's chief of staff as a member of the Task Force, perhaps even as the chairman, who would then be expected to report to Mrs. Clinton. It would seem quite anomalous to conclude that FACA would apply if the President's spouse were a member of the committee, but not if her chief of staff were the actual member.

 The President's implicit authority to enlist his spouse in aid of the discharge of his federal duties also undermines appellees' claim that treating the President's spouse as an officer or employee would violate the anti-nepotism provisions of 5 U.S.C. § 3110. That section prohibits any "public official" from appointing or employing a relative, such as a spouse, "in the agency in which he is serving or over which he exercises jurisdiction or control." *Id.* § 3110(b). Although section 3110(a)(1)(A) defines agency as "an executive agency," we doubt that Congress intended to include the White House or the Executive Office of the President. *Cf. Franklin v. Massachusetts,* —— U.S. ——, ——, 112 S.Ct. 2767, 2775, 120 L.Ed.2d 636 (1992) (holding that President is not "agency" for purposes of Administrative Procedure Act); *Meyer,* 981 F.2d at 1298 (President's advisers are not "agency" under FOIA); *Armstrong v. Bush,* 924 F.2d 282, 289 (D.C.Cir.1991) (President not APA "agency"). So, for example, a President would be barred from appointing his brother as Attorney General, but perhaps not as a White House special assistant. Be that as it may, it is not reasonable to interpret that provision to bring it into conflict with Congress' recognition of (and apparent authorization for) the President's delegation of duties to his spouse.

The anti-nepotism statute, moreover, may well bar appointment only to paid positions in government. *See* 5 U.S.C. § 3110(c). Thus, even if it would prevent the President from putting his spouse on the federal payroll, it does not preclude his spouse from aiding the President in the performance of his duties.

In sum, the government musters a strong argument in support of its interpretation of "full-time officer or employee" under FACA as including the President's spouse—whether or not a "First Lady." But it is by no means overwhelming. Indeed, the government is uncomfortable at having to choose whether Mrs. Clinton should be thought of as an officer or employee. The government's discomfort is quite understandable. Mrs. Clinton has not in any sense been appointed or elected to office, and, assuming she is an officer under Title 1, due to the duties delegated to her under 3 U.S.C. § 105(e), how, one might ask, could she be removed? All officers and employees of the United States, except the Vice President, can be removed, at least for cause, through the ultimate authority of the President. We suppose the President could withdraw any or all authority delegated to his spouse, but then he would be left without the official assistance of any family member. The very provision authorizing the delegation to the spouse provides for a delegation to another member of the President's family only "[i]f the President *does not have a spouse.*" 3 U.S.C. § 105(e) (emphasis added). That language seems to present the President with rather extreme alternatives.

What is more, section 105(e) would seem to apply whether or not the President's spouse held another job that an officer or employee of the government could not possibly hold. Suppose, for instance, that the President's spouse was counsel to a major law firm and spent a good portion of his or her time practicing law. Presumably, the spouse would still be authorized to provide assistance to the President under section 105(e) and would, thereby, also be an officer or employee of the government. The government suggests that this hypothetical does not create a problem under FACA, because a spouse in that situation, whether or not an

officer or employee, would not be full-time and so would not qualify for the exemption. But that answer may be too facile. How would we determine how much or what kind of outside activity was inconsistent with full-time status?

Suffice it to say that the question whether Mrs. Clinton's membership on the Task Force triggers FACA is not an easy one.[3] The government argues, therefore, that we should construe the statute not to apply here, because otherwise we would face a serious constitutional issue. The Supreme Court has noted many times that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Public Citizen v. Department of Justice*, 491 U.S. 440, 466, 109 S.Ct. 2558, 2572, 105 L.Ed.2d 377 (1989) (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988)). Only a few years ago the Court employed that very maxim of statutory construction to avoid applying FACA to the ABA committee that advised the Attorney General on the qualifications of prospective federal judicial nominees. *See id.* The government there argued that applying FACA would impair the effectiveness of the committee's deliberations (by exposing them to public examination), and thus would interfere with the advice that the committee provided to the Attorney General and ultimately, it was assumed, to the President. Such interference would encroach on the President's appointment power—his sole responsibility to nominate federal judges.[4] In order to escape that constitutional question, the Court held that the ABA committee was not "utilized" by the President because it was established and run by a private organization, even though the Act covers advisory committees established *or* utilized by the executive branch. *See id.* 491 U.S. at 455–65, 109 S.Ct. at 2566–72. The Court adopted, we think it is fair to say, an extremely strained construction of the word "utilized" in order to avoid the constitutional question. The gravity of the constitutional issue was revealed by the three concurring justices who were unable to accept the Court's statutory construction and believed that FACA was unconstitutional as applied to the ABA committee. *Id.* at 467–89, 109 S.Ct. at 2572–84 (Kennedy, J., concurring).

It is, of course, necessary before considering the maxim of statutory construction to determine whether the government's constitutional argument in this case is a powerful one. In other words, are we truly faced, as the Court thought it was in *Public Citizen*, with a grave question of constitutional law? The government relies primarily on the claim that an explicit presidential power is implicated. Article II of the Constitution provides that the President "shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient." U.S. CONST. art. II, § 3, cl. 1. According to the government, this clause gives the President the sole discretion to decide what measures to propose to Congress, and it leaves no room for congressional interference. To exercise this power, the government claims, the President also must have the constitutional right to receive confidential advice on proposed legislation.

Under the government's theory, FACA would interfere with the President's unbounded discretion to propose legislation. President Clinton formed the Task Force specifically to recommend legislation dealing with health care reform. FACA's requirement of public meetings would inhibit both

---

3. It is not clear how FACA applies if only one member of an advisory committee is not a full-time government officer or employee. How does the government carry out its obligation to ensure that the committee is "fairly" balanced in terms of the points of view represented?

4. Ironically, the ABA committee's role in advising administrations as to the qualifications of putative judges has over the years become more of an impediment (reflecting certain ABA institutional and, perhaps, political interests) than an aid to Presidents. R. Marcus & S. Torry, *ABA Judicial Evaluation Again Under Fire*, WASH. POST, May 7, 1989, A6; M. Thornton, *The ABA's Judgments on Judges*, WASH. POST, Sept. 25, 1987, A23.

candid discussion within the Task Force and its presentation of advice to the President. Challenging the district court's ruling, the government argues that this encroachment occurs regardless of whether the Task Force is engaged in information-gathering or internal deliberation. In either situation, the glare of publicity would inhibit the free flow of frank advice and would handicap the President's ability to develop legislation.

Appellees point out that the concurring opinion in *Public Citizen* commanded the votes of only three justices and rely, instead, on the Court's opinion in *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988).[5] *Morrison* upheld the Ethics in Government Act's creation of an independent counsel because it did not prevent the President "from accomplishing [his] constitutionally assigned functions," *id.* at 695, 108 S.Ct. at 2621 (quoting *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977)), even though the counsel was largely immune from the executive branch's operational control (she was appointed by a panel of judges and was removable only for good cause). Applying FACA to the Task Force, according to appellees, has a rather minor impact on the institution of the presidency compared to the much greater encroachment on the President's core executive function sanctioned in *Morrison.*

Nevertheless, the government maintains that *Morrison* is not directly on point. Picking up on Justice Kennedy's concurrence in *Public Citizen,* the government contends that the *Morrison* Court's imprecise balancing test, which is apparently less favorable to the President, does not apply when a textual grant of presidential authority is implicated. In distinguishing *Morrison,* Justice Kennedy said:

> Thus, for example, the relevant aspect of our decision in *Morrison* involved the President's power to remove Executive Officers, a power we had recognized is not

conferred by any explicit provision of the text of the Constitution (as is the appointment power) but rather is inferred to be a necessary part of the grant of the "Executive Power."

*Public Citizen,* 491 U.S. at 484, 109 S.Ct. at 2582 (Kennedy, J., concurring).[6] But because *Public Citizen* involved the President's textually granted power to appoint federal judges, the concurrence would have struck FACA down:

> Where a power has been committed to a particular Branch of the Government in the text of the Constitution, the balance already has been struck by the Constitution itself.

*Id.* at 486, 109 S.Ct. at 2583. The government argues that here, as in *Public Citizen,* but unlike in *Morrison,* we have an explicit textual delegation to the President to propose legislation.

We perceive several weaknesses in the government's position. First, the government ignores the *Morrison* Court's consideration of the President's Article II, section 3 responsibility to "take Care that the Laws be faithfully executed." *See Morrison,* 487 U.S. at 692–93, 108 S.Ct. at 2619–20. The Court specifically recognized that the statute before it encroached upon or burdened that responsibility, but concluded that the burden was not great enough to be unconstitutional.

> This is not a case in which the power to remove an executive official has been *completely* stripped from the President, thus providing no means for the President to ensure the "faithful execution" of the laws. . . . We do not think this limitation as it presently stands *sufficiently* deprives the President of control over the independent counsel to interfere *impermissibly* with his constitutional obligations to ensure the faithful execution of the laws.

*Id.* (emphasis added) (footnote omitted). *Morrison v. Olson,* thus, cannot be easily disposed of in accordance with the govern-

---

5. Justice Kennedy, who was recused in *Morrison,* was joined by Chief Justice Rehnquist and Justice O'Connor in *Public Citizen.* Justice Scalia, who dissented in *Morrison,* was, in turn, recused in *Public Citizen.*

6. *But see Bowsher v. Synar,* 478 U.S. 714, 721–27, 106 S.Ct. 3181, 3185–88, 92 L.Ed.2d 583 (1986) (removal power more important than appointment power in controlling subordinate officials).

ment's (and Justice Kennedy's) suggested distinction.

The President's constitutional duty to take care that the laws be faithfully executed, moreover, seems far greater in importance than his authority to recommend legislation. The Framers intended the Take Care Clause to be an affirmative duty on the President and the President alone. In contrast, the Recommendation Clause is less an obligation than a right. The President has the undisputed authority to recommend legislation, but he need not exercise that authority with respect to any particular subject or, for that matter, any subject.[7] Only the President can ensure that the laws be faithfully executed, but anyone in the country can propose legislation.

The government's focus on the Recommendation Clause seems somewhat artificial. Discussions on policy—whether they take place in executive branch groups or in pure FACA advisory committees—to some extent always implicate proposed legislation. Whenever an executive branch group considers policy initiatives, it discusses interchangeably new legislation, executive orders, or other administrative directives. Thus, virtually anytime an advisory group meets to discuss a problem, it will implicate the Recommendation Clause, from which all execu-

tive branch authority to recommend legislation derives. Accordingly, if the application of FACA to groups advising the President or anyone else in the executive branch were constitutionally problematic, insofar as those groups were advising on proposed legislation, FACA would be problematic with regard to virtually all policy advice. Under that reasoning FACA would be constitutionally suspect on its face—an argument the government declined to make.

■ We do think that the government's alternative, albeit implicit, argument is more persuasive. Application of FACA to the Task Force clearly would interfere with the President's capacity to solicit direct advice on *any* subject related to his duties from a group of private citizens, separate from or together with his closest governmental associates. That advice might be sought on a broad range of issues in an informal or formal fashion. Presidents have created advisory groups composed of private citizens (sometimes in conjunction with government officials) to meet periodically and advise them (hence the phrase "kitchen cabinets") on matters such as the conduct of a war.[8] Presidents have even created formal "cabinet committees" composed in part of private citizens.[9] This case is no different. Here, the

---

7. To be sure, during the Constitutional Convention in Philadelphia, the Framers changed the language of the clause from "may recommend" to "*shall* recommend." As James Madison recorded in his notes of the convention for August 24, 1787:

> On motion of Mr. Govr. Morris, "he may" was struck out, & "and" inserted before "recommend" in the clause 2d sect 2d art: X in order to make it the duty of the President to recommend, & thence prevent umbrage or cavil at his doing it.

J. MADISON, NOTES OF DEBATES IN THE FEDERAL CONVENTION OF 1787, 464 (G. Hunt & J. Scott, eds. 1987). Gouverneur Morris' amendment suggests that the clause was intended to squelch any congressional objections to the President's *right* to recommend legislation—hence the prevention of "umbrage or cavil." *See* J. Sidak, *The Recommendation Clause*, 77 GEO L.J. 2079, 2082 (1989).

8. For example, President Johnson often sought advice from Clark Clifford and Justice Fortas, "two old and trusted friends from outside the Executive Branch," along with government officials on matters concerning the Vietnam War.

*See, e.g.,* L. JOHNSON, THE VANTAGE POINT. PERSPECTIVES OF THE PRESIDENCY 1963–1969 at 235–37 (1971)

9. President Ford, in 1975, convened a "cabinet committee" composed of the Secretary of State, the Secretary of Commerce, the Secretary of Labor, the President of the AFL–CIO, and the President of the Chamber of Commerce to formulate the government's policy toward the International Labor Organization. President Carter continued the same body. *See, e.g., Committee Fails to Agree on U.S. ILO Membership*, WASH. POST, Oct. 13, 1977, A24. Neither President apparently acknowledged FACA's application. *See, e.g.,* GENERAL SERVICES ADMINISTRATION, FEDERAL ADVISORY COMMITTEES: FOURTH ANNUAL REPORT OF THE PRESIDENT COVERING CALENDAR YEAR 1975 at 54–55 (1976) (no mention of ILO committee in list of presidential advisory committees); *see also* GENERAL SERVICES ADMINISTRATION, FEDERAL ADVISORY COMMITTEES· FIFTH ANNUAL REPORT OF THE PRESIDENT COVERING CALENDAR YEAR 1976 at 55–56 (1977) (same). In 1980, however, President Carter continued that structure, but explicitly recognized FACA's coverage (after the issue that gave rise to the

President has formed a committee of his closest advisers—cabinet secretaries, White House advisers, and his wife—to advise him on a domestic issue he considers of the utmost priority.

█ Applying FACA to the Task Force does not raise constitutional problems simply because the Task Force is involved in proposing legislation. Instead, difficulties arise because of the Task Force's operational proximity to the President himself—that is, because the Task Force provides advice and recommendations directly to the President. The Supreme Court has recognized that a President has a great need to receive advice confidentially:

> [There is a] valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art. II powers, the privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties.

*United States v. Nixon,* 418 U.S. 683, 705–06, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) (footnotes omitted); *see also Nixon v. Administrator of Gen. Servs.,* 433 U.S. 425, 441–49, 97 S.Ct. 2777, 2789–93, 53 L.Ed.2d 867 (1977). *Nixon v. Administrator of General Services* further explains that the President is entitled to confidentiality in the performance of his "responsibilities" and "his office," and " 'in the process of shaping policies and making decisions.' " 433 U.S. at 449, 97 S.Ct. at 2793 (quoting *United States v. Nixon,* 418 U.S. at 708, 94 S.Ct. at 3107). Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes. In *Meyer v. Bush,* 981 F.2d at 1293–97, for example, we held that the President could create a Task Force composed of cabinet secretaries and other close advisers to study regulatory reform without having to comply with FOIA. In this regard, FACA's requirement that an advisory committee must be "fairly balanced in terms of the view represented" would—if enforceable and applied to groups of presidential advisers—restrict the President's ability to seek advice from whom and in the fashion he chooses.

The ability to discuss matters confidentially is surely an important condition to the exercise of executive power. Without it, the President's performance of any of his duties—textually explicit or implicit in Article II's grant of executive power—would be made more difficult. In designing the Constitution, the Framers vested the executive power in one man for the very reason that he might maintain secrecy in executive operations. As Alexander Hamilton wrote in the Federalist Papers:

> *Decision, activity, secrecy, and dispatch* will generally characterise [sic] the proceedings of one man, in a much more eminent degree, than the proceedings of any greater number; and in proportion as the number is increased, these qualities will be diminished.

THE FEDERALIST No. 70, at 472 (J. Cooke, ed., 1961) (emphasis added). The Framers thus understood that secrecy was related to the executive's ability to decide and to act quickly—a quality lacking in the government established by the Articles of Confederation. If a President cannot deliberate in confidence, it is hard to imagine how he can decide and act quickly.

█ This Article II right to confidential communications attaches not only to direct communications with the President, but also to discussions between his senior advisers. Certainly Department Secretaries and White House aides must be able to hold confidential meetings to discuss advice they secretly will render to the President. Congress, in another context, has recognized that the Presi-

---

committee—whether the United States should withdraw from the ILO—had been resolved).

*See* Exec. Order No. 12,216, 45 Fed.Reg. 41,619 (1980).

dent's right to confidential communications extends to meetings between his top advisers. For example, FOIA, 5 U.S.C. § 552, exempts "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156, 100 S.Ct. 960, 971, 63 L.Ed.2d 267 (1980) (quoting H.R. REP. No. 1380, 93d Cong., 2d Sess. 14 (1974)); *Meyer v. Bush*, 981 F.2d at 1291–92.

A statute interfering with a President's ability to seek advice directly from private citizens as a group, intermixed, or not, with government officials, therefore raises Article II concerns. This is all the more so when the sole ground for asserting that the statute applies is that the President's own spouse, a member of the Task Force, is not a government official. For if the President seeks advice from those closest to him, whether in or out of government, the President's spouse, typically, would be regarded as among those closest advisers.

■ As we have indicated, we do not place much significance on the government's claim that this sort of interference is qualitatively, in constitutional terms, more troublesome insofar as it relates to advice the President seeks concerning the exercise of an enumerated power. If we were to go on to decide the constitutionality question, we would be obliged to ask whether, in *Morrison v. Olson* terms, this asserted application of FACA "impermissibly" burdens executive power. *Morrison* tells us to balance how much the interference with the President's executive power prevents the President "from accomplishing his constitutionally assigned functions," *Morrison*, 487 U.S. at 695, 108 S.Ct. at 2621, against the "overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. at 443, 97 S.Ct. at 2790. We readily confess that this balancing test is not one that, as judges, we can apply with confidence. This is all the more reason to view the constitutional issue soberly. We are satisfied that the application of FACA to the Task Force seriously burdens executive power. And our reading of *Morrison* does not lead us easily to a conclusion that the burden placed is a permissible one.

■ The court below correctly recognized the constitutional difficulties that FACA's application to the Task Force created. The court, therefore, ruled the Act partially unconstitutional, insofar as it was applied to the meetings in which the Task Force actually advised the President. When the Task Force was engaged in "information-gathering and information-reporting," however, the court thought that the President's constitutional interests were not so seriously implicated.

We believe it is the Task Force's operational *proximity* to the President, and not its exact function at any given moment, that implicates executive powers and therefore forces consideration of the *Morrison* test. The President's confidentiality interest is strong regardless of the particular role the Task Force is playing on any given day. Indeed, the two functions naturally interrelate and can only be divided artificially. If public disclosure of the real information-gathering process is required, the confidentiality of the advice-giving function inevitably would be compromised. If you know what information people seek, you can usually determine why they seek it. A group directly reporting and advising the President must have confidentiality at each stage in the formulation of advice to him. As we said in *Meyer*, "[p]roximity to the President, in the sense of continuing interaction, is surely in part what Congress had in mind when it exempted [from FOIA] the President's 'immediate personal staff.'" 981 F.2d at 1293 (citation omitted). And, as we recognized in *Soucie v. David*, 448 F.2d 1067 (D.C.Cir. 1971), FOIA's exemption may be constitutionally required to protect the President's executive powers. In any event, the district judge decided to truncate the statute in light of constitutional concerns only because it determined that FACA applied to the Task Force.

We think the district court should have acted otherwise. Prudent use of the maxim of statutory construction allows us to avoid the difficult constitutional issue posed by this case. The question whether the President's

spouse is "a full-time officer or employee" of the government is close enough for us properly to construe FACA not to apply to the Task Force merely because Mrs. Clinton is a member. We follow the Supreme Court's lead, if not its strict precedent, in recognizing that [if the Act] were "[r]ead unqualifiedly, it would extend FACA's requirements to any group of two or more persons, or at least any formal organization, from which the President or an executive agency seeks advice." *Public Citizen,* 491 U.S. at 452, 109 S.Ct. at 2565 (footnote omitted). Because it believed that Congress could not have intended such a result, the *Public Citizen* majority read "utilize" to exclude the ABA committee. If the Supreme Court correctly construed the statute not to cover the advice the Attorney General receives, on behalf of the President, from the ABA, the statutory construction issue we face should be resolved *a fortiori* in favor of the government.

We, therefore, read the phrase "full-time officer or employee of the government" in FACA to apply to Mrs. Clinton. In doing so, we express no view as to her status under any other statute.[10]

### IV.

The district court, having concluded that the Task Force was a FACA advisory committee, dismissed under Rule 12(b)(6) appellees' claim that the working group was also covered by FACA. The court thought that under *National Anti–Hunger Coalition v. Executive Committee,* 557 F.Supp. 524 (D.D.C.), *aff'd,* 711 F.2d 1071 (D.C.Cir.1983) (*"Anti–Hunger"*), subgroups of a FACA committee should be regarded as staff of the advisory committee and not as advisory committees themselves. *See Anti–Hunger,* 557 F.Supp. at 529. Based on Mr. Magaziner's affidavit, the district court determined that the working group merely gathered information to be passed on to the Task Force. Appellees cross-appeal the district court's ruling and its corollary refusal to permit

further discovery into the status and operations of the working group.

The government challenges our jurisdiction to consider the cross-appeal because the district court's rulings on the working group are neither independent final judgments, nor covered by the preliminary injunction against the Task Force which is before us on an interlocutory appeal pursuant to 28 U.S.C. § 1292(a). We have said that our jurisdiction over an interlocutory appeal, however, is considerably broader:

> [R]eview quite properly extends to all matters *inextricably bound up with the remedial decision* .... [T]he scope of review may extend further to allow disposition of all matters appropriately raised by the record, including entry of final judgment. Jurisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial court development.

*Wagner v. Taylor,* 836 F.2d 578, 585 (D.C.Cir.1987) (emphasis added) (quoting *Energy Action Educational Found. v. Andrus,* 654 F.2d 735, 745 n. 54 (D.C.Cir.1980), *rev'd on other grounds,* 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981)); *see also* 16 C. WRIGHT, A. MILLER, E. COOPER & E. GRESSMAN, FEDERAL PRACTICE & PROCEDURE § 3921, at 17–20 (1977). The district court's final disposition of the claim against the working group was "bound up" with its reasons for granting the injunction against the Task Force. Once it is determined that the Task Force is not covered by FACA, the implicit analytical premises of the district court's decision as to the working group are removed. Moreover, had the district court determined, as have we, that the claim against the Task Force was invalid and then also dismissed the claim against the working group, the latter unquestionably would be appealable as well. Under these circumstances, we think it is appropriate to consider the cross-appeal.[11]

---

10. We do not need to consider whether Mrs. Clinton's presence on the Task Force violates the Hatch Act, 5 U.S.C. § 7324(a), the Anti–Deficiency Act, 31 U.S.C. § 1342, or any conflict of interest statutes.

11. The lower court dismissed appellees' claim under Rule 12(b)(6) because it found that appellees had failed to state a claim upon which relief could be granted. Mem.Op. at 89. It also noted that it could have dismissed appellees' claims

As it argued below, the government claims that the working group is not in contact with the President and is not, therefore, "utilized" by him. That seems to us a strange argument. There are two exceptions to FACA's inclusion of all presidential advisory groups: (i) where the advisory committee is independently established and operated by a private organization, *see Public Citizen*, 491 U.S. at 457–59, 109 S.Ct. at 2567–69; and (ii) where the group is composed wholly of full-time government officials. *See* 5 U.S.C.App. 2, § 3(2)(iii). We have construed the second exception here to extend to a cabinet committee that includes the First Lady. The government now presses upon us a third exception, one for advisory committees that do *not* meet face-to-face with the President. The government's argument, however, conflicts with the serious constitutional concerns we have recognized concerning the Task Force. The statute cannot be properly interpreted as applying only to those advisory committees, established in the Executive Office of the President, that present the most delicate constitutional problems.[12] Otherwise, the government's argument effectively would render almost all presidential advisory committees free from FACA. Committees in direct contact with the President implicate the President's executive power and hence cannot be covered by FACA, while committees not directly in contact are not "utilized." In any event, the statutory language does not remotely support the government. Not only does FACA define an advisory committee as a task force or "any subcommittee or other subgroup thereof," 5 U.S.C.App. 2, § 3(2), but it also specifies that an advisory committee is a group that is either *established* or

*utilized* by the President. *See id.* Certainly the President can establish an advisory group that he does not meet with face-to-face. In *Public Citizen* the Court did not suggest that FACA could be avoided merely because the ABA committee communicated with the Justice Department rather than with the President.

The district court accepted a variation of the government's argument by concluding that the working group was not really a subgroup of the Task Force within the meaning of FACA, but rather only staff to the Task Force. The court relied, as we noted, on the *Anti–Hunger* case, in which we affirmed Judge Gesell's decision to similarly treat subordinate working groups operating under the Executive Committee of the Private Sector Survey. Although we affirmed the decision, we did not explicitly approve the judge's reasoning relating to the supposed staff groups; rather, we rejected an effort to challenge his decision based on new information not in the record. *See National Anti–Hunger Coalition v. Executive Committee*, 711 F.2d 1071, 1075 (D.C.Cir.1983). In any event, *Anti–Hunger* presented crucially different facts. That case involved the Executive Committee of the Private Sector Survey, formed by President Reagan to obtain management and cost control advice from the private sector. The Executive Committee, composed of 150 private citizens, had a subcommittee composed of 30 members and also had 36 task forces that performed the preliminary work of the survey. *Anti–Hunger*, 557 F.Supp. at 525–26. The government conceded, in that litigation, that the Executive Committee and the subcommittee were both FACA committees and it

under FED.R.CIV.P. 56, because appellees had failed to state that further discovery was necessary before summary judgment could be granted. *Id.* at 89 n. 11. As we will discuss, the legal basis for the Rule 12(b)(6) ruling, or a Rule 56 ruling, was incorrect. Furthermore, contrary to the district court's decision, Rule 56 does not require a party to state in its discovery motion that discovery is necessary before a court may rule on summary judgment. Indeed, a party's filing of a discovery motion would seem implicitly to assert just that. But under Rule 12(b)(6), once the Magaziner affidavit was filed and considered the district judge was obliged to permit reasonable discovery as to the facts set forth in

the affidavit. *See First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1380 (D.C.Cir. 1988).

**12.** The government, only at oral argument, and rather tentatively, suggested that application of FACA to *any* advisory groups established and utilized by the President, because they advise someone in the Executive Office of the President, raises constitutional problems. We do not think we should entertain a constitutional argument of such enormous significance made in so glancing a fashion. After all, it could be thought to come close to an argument that the government disavowed—that FACA is unconstitutional on its face.

was only thereafter that the district court determined that the task forces were not FACA committees, but staff.

Our conclusion that the Task Force is a committee wholly composed of government officials makes this case entirely different. In contrast to the situation here, in *Anti-Hunger* the top levels of the *outside* advisory groups were covered by FACA—both the executive committee of 150 and the subcommittee of 30. In that scenario, there is less reason to focus on subordinate advisers or consultants who are presumably under the control of the superior groups. It is the superior groups, after all, that will give the advice to the government, and which, in accordance with the statute, must be "reasonably" balanced. But when the Task Force itself is considered part of the government— due to the government officials exemption— we must consider more closely FACA's relevance to the working group. For it is the working group now that is the point of contact between the public and the government. The district court's conclusion that the working group could be disregarded as staff depended on its determination that the Task Force was covered by FACA. Our disagreement with the district court on the latter issue therefore compels a different analysis of the working group's status.

Alternatively, the government argues that the working group is not, as a matter of law, a FACA advisory committee because it is not expected to offer consensus advice. In making this argument, the government relies on a regulation issued by the General Services Administration:

> The following are examples of advisory meetings or groups not covered by the Act or this subpart; ... (i) Any meeting initiated by a Federal official(s) with more than one individual for the purpose of obtaining the advice of individual attendees and not for the purpose of utilizing the group to obtain consensus advice or recommendations. However, agencies should be aware that such a group would be covered by the Act when an agency accepts the

group's deliberations as a source of consensus advice or recommendations.

41 C.F.R. § 101–6.1004(i) (1992).

██ As we have so often noted, we do not defer to an agency's construction of a statute interpreted by more than one agency, *see, e.g., FLRA v. Department of Treasury*, 884 F.2d 1446, 1451 (D.C.Cir.1989), let alone one applicable to all agencies, *see Reporters Comm. for Freedom of the Press v. Department of Justice*, 816 F.2d 730, 734 (D.C.Cir. 1987), *rev'd on other grounds*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). Nevertheless, we think the government's regulation expresses a concept similar to one that we find embedded in the statute. It is not so much that a group is not a FACA advisory committee unless it gives "consensus" advice. To be sure, many committees are convened with that expectation. *See, e.g.,* The Commission on the Future of Worker–Management Relations, 58 Fed.Reg. 27,311 (1993). Others, however, are established presumably with the full expectation that the positions to be taken and the advice to be offered may well be sharply divided. *See, e.g.,* The Presidential Commission or the Assignment of Women in the Armed Forces, 57 Fed.Reg. 49,394 (1992). And since one of the purposes of FACA is to achieve some balance, and thereby diverse views on advisory committees, it would be passing strange if FACA only applied to those committees that would offer consensus recommendations.

██ The point, it seems to us, is that a group is a FACA advisory committee when it is asked to render advice or recommendations, *as a group*, and not as a collection of individuals. The group's activities are expected to, and appear to, benefit from the interaction among the members both internally and externally. Advisory committees not only provide ideas to the government, they also often bestow political legitimacy on that advice. As the House Committee that investigated advisory committees before FACA's passage stated: "The work product of a committee composed of distinguished and knowledgeable individuals appointed by the President to advise him is presumed to have value and should be considered."

H.R.Rep. No. 1731, 91st Cong., 2d Sess. 12 (1970).

Advisory committees are not just mechanisms for transmitting policy advice on a particular subject matter to the government. These committees also possess a kind of political legitimacy as representative bodies. Membership on a committee is often highly prized and sought after because it carries recognition and even prestige. When the executive branch endorses its advice and seeks to promote the policy course suggested by the committee, the executive branch draws upon the committee's political legitimacy. Congress' effort to ensure that these committees are balanced in terms of viewpoint recognizes their usefulness for political (and patronage) purposes. But committees bestow these various benefits only insofar as their members act as a group. The whole, in other words, must be greater than the sum of the parts.

Thus, an important factor in determining the presence of an advisory committee becomes the formality and structure of the group. Judge Gesell, in another district court case, *Nader v. Baroody*, 396 F.Supp. 1231 (D.D.C.1975), seems to have approached the same notion by focusing on the word "established" in FACA. *Nader* involved meetings between an assistant to the President and a changing slate of federal officials and private sector groups. *See id.* The groups met for the express purpose of exchanging views on a variety of subjects. In exempting these meetings from FACA, the court noted that "the committees were not formally organized and there is little or no continuity." *Id.* at 1234.

Since form is a factor, it would appear that the government has a good deal of control over whether a group constitutes a FACA advisory committee. Perhaps, for that reason, it is a rare case when a court holds that a particular group is a FACA advisory committee over the objection of the executive branch. In order to implicate FACA, the President, or his subordinates, must create an advisory group that has, in large measure, an organized structure, a fixed membership, and a specific purpose. The government suggests that the working groups, composed

as they are of a crowd of 340 virtually anonymous persons, do not bear the characteristics of the paradigm FACA advisory committee. That may well be so. The working groups, as a whole, seem more like a horde than a committee. On the other hand, the groups have been created ("established") with a good deal of formality and perhaps are better understood as a number of advisory committees. We simply cannot determine how to classify the working groups based on the record before us.

Finally, the government claims that all of the members of the working groups are full-time officers or employees of the government, and, for that reason alone, the working groups are not FACA advisory committees. The three-hundred members drawn from the agencies, the Executive Office of the President, and from the congressional staffs are concededly within that category. The working group also includes, however, 40 "special government employees." The government claims that these individuals are also "full-time" government employees, even though they have been employed by an agency or the Executive Office of the President for less than 130 days in a year, some without compensation. The record does not reflect where these persons come from, nor does it show how many hours they work. We are, moreover, unsure whether FACA's definition of "full-time" extends to a person who works for the government for less than 130 days out of a year. The government directs us to the conflict of interest provisions of Title 18, which define a "special Government employee" as:

> an officer or employee of the executive or legislative branch of the United States Government ... who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed [130] days during any period of [365] consecutive days, *temporary duties either on a full-time or intermittent basis.*

18 U.S.C. § 202(a) (1988) (emphasis added). The government argues that section 202 clearly implies that a temporary employee can be "full-time." Intermittent (or non-fulltime) applies, according to the government, to those who work less than a full day.

We do not believe section 202(a) helps the government. Just as we did not read 5 U.S.C. §§ 2104, 2105 to govern the question of whether Mrs. Clinton is a federal officer or employee, we do not think that Title 18's definitions should necessarily control FACA. We must construe FACA in light of its purpose to regulate the growth and operation of advisory committees. FACA would be rather easy to avoid if an agency could simply appoint 10 private citizens as special government employees for two days, and then have the committee receive the section 3(2) exemption as a body composed of full-time government employees. Moreover, section 202 contrasts "full-time" with "intermittent," and so "full-time" seems to mean no more than not "intermittent." There is no reason to think that not "intermittent" for section 202 purposes has any bearing on whether the employee is "full-time" for FACA purposes. Whether the special government employees are full-time, however, is, in part, a factual issue that was not developed below due to the lack of discovery.

A third class of persons are described as consultants. According to the government, the consultants attend meetings on an intermittent basis, with or without compensation, and have no "supervisory role or decision-making authority." Drawn from the ranks of the medical profession, the academy, and from business, they only provide information and opinion. These consultants raise a different question from that presented by the other two classes of working group employees. The key issue, it seems to us, is not whether these consultants are "full-time" government employees under section 3(2), but whether they can be considered members of the working group at all. When an advisory committee of wholly government officials brings in a "consultant" for a one-time meeting, FACA is not triggered because the consultant is not really a member of the advisory committee. In that situation, the relationship between the temporary consultant and committee is very similar to the one between the White House officials and various private sector representatives exempted from FACA in *Nader*. We are confident that Congress did not intend FACA to ex-

tend to episodic meetings between government officials and a consultant. To do so would achieve the absurd result *Public Citizen* warned against: reading FACA to cover every instance when the President (or an agency) informally seeks advice from two or more private citizens.

But a consultant may still be properly described as a member of an advisory committee if his involvement and role are functionally indistinguishable from those of the other members. Whether they exercise any supervisory or decisionmaking authority is irrelevant. If a "consultant" regularly attends and fully participates in working group meetings as if he were a "member," he should be regarded as a member. Then his status as a private citizen would disqualify the working group from the section 3(2) exemption for meetings of full-time government officials.

\* \* \* \* \* \*

When we examine a particular group or committee to determine whether FACA applies, we must bear in mind that a range of variations exist in terms of the purpose, structure, and personnel of the group. Perhaps it is best characterized as a continuum. At one end one can visualize a formal group of a limited number of private citizens who are brought together to give publicized advice as a group. That model would seem covered by the statute regardless of other fortuities such as whether the members are called "consultants." At the other end of the continuum is an unstructured arrangement in which the government seeks advice from what is only a collection of individuals who do not significantly interact with each other. That model, we think, does not trigger FACA.

We simply have insufficient material in the record to determine the character of the working group and its members. We understand why the district court, believing the Task Force covered by FACA, thought it unnecessary and inappropriate to put the working group under further scrutiny. But, as we have indicated, because we differ with the district court concerning the Task Force, we believe further proceedings, including ex-

pedited discovery, are necessary before the district court can confidently decide whether the working group is a FACA committee.

Accordingly, we reverse the district court and lift the preliminary injunction on the operations of the Task Force. The Task Force need not comply with the requirements of FACA because it is a committee composed wholly of full-time government officials. We also reverse the district court's dismissal of appellees' claims as to the working group under Rule 12(b)(6). We remand for further proceedings, including expedited discovery, regarding the working group.

*So ordered.*

BUCKLEY, Circuit Judge, concurring in the judgment:

I admit at the outset the persuasive force of the majority's opinion—a force derived, I think, from a comparison of the most obvious facts of this case with those of *Public Citizen v. United States Department of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). *Public Citizen* interpreted the word "utilized" so as to exclude, from the Federal Advisory Committee Act's ("FACA's") reach, the Justice Department's use of a committee of the American Bar Association whose only mission was to advise on appointments to the federal judiciary. In concluding that Congress did not intend to subject the ABA Committee on the Judiciary to FACA's requirements, the Court acknowledged that what "tip[ped] the balance decisively against FACA's application," *id.* at 465, 109 S.Ct. at 2572, was the "cardinal principle" that where "a serious doubt of constitutionality is raised, ... the Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Id.* at 465–66, 109 S.Ct. at 2572. Here, to achieve a similar end, we are asked only to stretch the phrase "officer or employee of the Federal Government" far enough to include a person who is greeted like a head of state, guarded by the Secret Service, and funded from the public fisc. On first appearances, *Public Citizen* would seem to support both the majority's result and the reasoning used to reach it.

If this case is to be distinguished from *Public Citizen*, it is not because of a lack of gravity in the constitutional issues it pres-

ents. In *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (*"Nixon I"*), and *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (*"Nixon II"*), the Supreme Court recognized a constitutionally grounded doctrine of executive privilege which holds that Presidential communications are presumptively privileged against disclosure:

> Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process....
>
> ....
>
> A President ... must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

*Nixon I*, 418 U.S. at 705, 708, 94 S.Ct. at 3106, 3107. The Court found that this privilege extends

> to communications in performance of a President's responsibilities ... and made in the process of shaping policies and making decisions.

*Nixon II*, 433 U.S. at 449, 97 S.Ct. at 2793 (quoting *Nixon I*, 418 U.S. at 708, 711, 713, 94 S.Ct. at 3107, 3109, 3110) (internal quotation marks, brackets, and citations omitted). And it set forth standards for evaluating intrusions on privileged communications:

> [I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote

objectives within the constitutional authority of Congress.

*Id.* 433 U.S. at 443, 97 S.Ct. at 2790 (citations to *Nixon I* omitted).

We confront in this case a task force consisting of the President's closest advisors that was established to address a paramount political priority. Because it included his wife—by all accounts, a person whose policy advice he has relied on throughout his public life—the Task Force on National Health Care Reform arguably was bound by law to conduct its proceedings in public. Given these circumstances, the considerations animating the Presidential privilege, like the President's claim of privilege itself, are before us in pointed fashion. My colleagues, sensing the weight of these issues, hold that we may avoid addressing them through "prudent use" of *Public Citizen's* "maxim of statutory construction." Maj.Op. at p. 910, I cannot agree.

I begin with the axiom that in interpreting a statute, a court must ascertain the will of the enacting Congress. Here I admit to detecting something of an implicit argument in the Government's pleadings before this court. To the extent that it may be discerned, this argument begins with an assumption that *Public Citizen's* result could not have been reached through genuine interpretation—interpretation that is consistent with the will of Congress—and ends with the conclusion that *Public Citizen* authorizes courts to avoid constitutional issues by ascribing implausible meanings to the most unambiguous language. The suggestion, I admit, is tempting. But it is also barred by the very decision on which the Government places its principal reliance. *Public Citizen* states explicitly that courts "cannot press statutory construction to the point of disingenuous evasion, even to avoid a constitutional question." 491 U.S. at 467, 109 S.Ct. at 2573 (internal quotation marks and citation omitted).

The weakness of the position that FACA may be interpreted to exclude the Task Force is suggested by the Government's vacillation on the question of Mrs. Clinton's status. Before the district court, the Government argued that the Task Force was not subject to FACA because Mrs. Clinton was the functional equivalent of a federal employee. In its opening brief here, it argued that she was either an officer or an employee without saying which. On reply, it said explicitly that Mrs. Clinton was an "officer." And at argument, it retreated to ambiguity and again refused to categorize her. In fact, the Government's only consistent position has been that FACA is not subject to those statutory definitions of "officer" and "employee" that most logically apply to it.

FACA appears in the appendix to Title 5 of the United States Code. Sections 2104 and 2105 of Title 5 contain the following definitions:

§ 2104. **Officer**

(a) *For the purpose of this title,* "officer", except as otherwise provided by this section or when specifically modified, means a justice or judge of the United States and an individual who is—

(1) required by law to be appointed in the civil service by one of the following acting in an official capacity—

(A) the President;

(B) a court of the United States;

(C) the head of an Executive agency; or

(D) the Secretary of a military department;

(2) engaged in the performance of a Federal function under authority of law or an Executive act; and

(3) subject to the supervision of an authority named by paragraph (1) of this section, or the Judicial Conference of the United States, while engaged in the performance of the duties of his office....

§ 2105. **Employee**

(a) *For the purpose of this title,* "employee", except as otherwise provided by this section or when specifically modified, means an officer and an individual who is—

(1) appointed in the civil service by one of the following acting in an official capacity—

(A) the President;

(B) a Member or Members of Congress, or the Congress;

(C) a member of a uniformed service;

(D) an individual who is an employee under this section;

(E) the head of a Government controlled corporation; or

(F) an adjutant general designated by the Secretary concerned under section 709(c) of title 32;

(2) engaged in the performance of a Federal function under authority of law or an Executive act; and

(3) subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position....

5 U.S.C. §§ 2104, 2105 (emphasis added).

The common denominator of these provisions is the requirement that both officers and employees be "appointed in the civil service." In the Executive Branch, the civil service consists of (1) positions requiring Senate confirmation, (2) the "Senior Executive Service," (3) the "competitive service," and (4) "positions which are specifically excepted from the competitive service by or under statute." 5 U.S.C. § 2102(a). Mrs. Clinton does not wear any of these labels. See, e.g., 5 U.S.C. § 3132(a)(2) (defining "Senior Executive Service position"). The Government's (and the majority's) strategy, then, is to argue that she need not satisfy the section 2104 and 2105 definitions because they do not apply to FACA. Specifically, because FACA has been codified in an appendix to Title 5, not in the title proper, the Government contends that the sections do not govern the meaning of "officer" and "employee" as used in the definition of "advisory committee." For several reasons, I disagree.

First, there is the plain meaning of the statutory language. An appendix to a title of the United States Code necessarily qualifies as a part of that title. If it did not, then the appendix would be part of no title whatever and would be an appendix to the Code as a whole. Yet FACA appears in the Code under the banner, "Title 5, Appendix." Because sections 2104 and 2105 state plainly that they apply "[f]or the purpose of" Title 5, and because FACA is a part of that title, the definitions apply to FACA.

Second, Congress surely knew that FACA would be codified under Title 5. The same statute that adopted sections 2104 and 2105 also stipulated that Title 5 be captioned: "Government Organization and Employees." Pub.L. No. 89–554, 80 Stat. 378, 408–09 (1966). A glance at the captions of the remaining 49 titles in the Code confirms that Title 5 is the only one under which FACA could have been codified.

Third, there are the practical considerations. The Ethics in Government Act, codified alongside FACA in Title 5's appendix, requires financial disclosures from "each officer or employee in the executive branch" who meets certain criteria. Ethics in Government Act of 1978, 5 U.S.C.App. 6, §§ 101(a), 101(f)(3) (1991 Supp.). FACA imposes open-meeting and other requirements on committees not "composed wholly of full-time officers or employees of the Federal Government." 5 U.S.C.App. 1, § 3(2) (1988). And, although each of those statutes contains a sizable definitional section, neither defines either "officer" or "employee." See 5 U.S.C.App. 1, § 3 (1988); 5 U.S.C.App. 6, § 109 (1991 Supp.). The Government tells us that those terms are intentionally left undefined even though Congress took the trouble, in those statutes, to define terms that are of far less significance. See, e.g., 5 U.S.C.App. 2, § 3(4) (1988) ("The term 'Presidential advisory committee' means an advisory committee which advises the President"); 5 U.S.C.App. 6, § 109(3) (1991 Supp.) (" 'designated agency ethics official' means an officer or employee who is designated to administer the provisions of this title within an agency"). But without definitions of "officer" and "employee," neither statute could be sensibly administered. The better explanation for the absence of these definitions is that their repetition in FACA and the Ethics in Government Act would have been redundant.

Finally, there is the apparent reasoning behind FACA's location in Title 5's appendix. The United States Code is published pursuant to 1 U.S.C. §§ 201–13 (1988). That law

requires the codification of new laws in annual Code supplements and permits the publication of an entirely new Code every five years. *See id.* § 202. Thus, the current United States Code and supplement contain all laws of the United States that are "general and permanent in their nature." *Id.* § 204(a). As of 1988, ten of the fifty U.S.C. titles contained an appendix. *See* 5, 10, 11, 18, 26, 28, 40, 46, 49, 50 U.S.C. (1988). Some statutes have been placed in appendices because, while considered more than temporary, they are viewed as less than permanent additions to the Code. *See* 40 U.S.C.App. (Appalachian Regional Development Act of 1965). Other statutes have been relegated to appendices because they were not enacted directly by Congress. *See* 11 U.S.C.App. (Bankruptcy Rules and Official Forms as promulgated by Supreme Court pursuant to 28 U.S.C. § 2075). With respect to Title 5, Congress has divided it into three parts: "The Agencies Generally" (Part I), "Civil Service Functions and Responsibilities" (Part II), and "Employees" (Part III). *See* Pub.L. No. 89–554, 80 Stat. 378 (1966), *as amended by* Pub.L. No. 96–54, § 2(a)(1), 93 Stat. 381 (1979). An appendix to Title 5, then, is the natural place to codify statutes that relate to "Government Organization and Employees" but do not pertain to "The Agencies Generally," "Civil Service Functions and Responsibilities," or "Employees." As of 1988, five acts, including FACA, had been codified in Title 5's appendix. None of these fits within any of the three pigeonholes into which the main body of the title has been divided.

As against all of this—the statute's plain language, the imputed knowledge of its draftsmen, the practical need for Title 5's definitions to apply to its appendix, and the apparent reasons for FACA's placement there—the Government can offer a bare shred of legislative history. It points out that the Senate version of FACA explicitly incorporated the Title 5 definitions of "officer" and "employee," but that these were dropped at conference. The question, of course, is whether the conferees discarded the definitions because they were redundant (as FACA was destined for codification under Title 5), or because they wished the definitions not to apply to FACA.

The evidence on this issue consists of statements from the reports of the Senate Committee on Government Operations and the House–Senate Conference Committee. Referring to the section of the Senate bill that incorporated definitions to be found in the main body of Title 5, namely, those for "agency" (5 U.S.C. § 551(1)), "officer" (5 U.S.C. § 2104), and "employee" (5 U.S.C. § 2105), the Senate Report stated only that these three definitions had "been chosen to give the broadest interpretation to the coverage commensurate with generally accepted principles of law." S.Rep. No. 1098, 92d Cong., 2d Sess. 8 (1972). The Conference Committee Report merely noted that "[t]he conference substitute deletes the Senate amendment definitions of 'officer' and 'employee.'" H.R.Conf.Rep. No. 1403, 92d Cong., 2d Sess. 9 (1972). The definition of "agency," however, was retained.

The Government infers, from the deletion of two of the Senate definitions and the retention of the third, that the conferees found the definitions of "officer" and "employee" inapplicable to FACA. There is a far more plausible explanation. As sections 2104 ("officer") and 2105 ("employee") were applicable to all statutes codified under Title 5, they were superfluous. The definition of "agency," by contrast, appears under the heading, "For the purpose of this *subchapter*—," 5 U.S.C. § 551 (emphasis added), and therefore would not apply to FACA unless specifically incorporated into that Act.

Even if we could disregard the definitions found in Title 5, we would still be compelled to attach meanings to the words "officer" and "employee" that Congress might reasonably have had in mind. To this end, I have examined other sources for definitions of these terms. At the outset, I dismiss the possibility that Mrs. Clinton might be considered an employee. In these proceedings, the Government has not attempted to argue that Mrs. Clinton is an employee for purposes of FACA—no doubt because her services are unpaid. *Cf.* Black's Law Dictionary 471 (5th ed. 1979) (defining employee as "[o]ne who works for an employer; a person working for salary or wages"). And while the majority

does assert that Mrs. Clinton "could still be regarded as an 'employee'" under FACA, Maj.Op. at p. 904, it too lacks an argument in support of the proposition. In particular, it ignores the fact that, while subsections (a) and (b) of 3 U.S.C. § 105 explicitly "authorize[ ]" the President "to appoint and fix the pay of [White House] employees," subsection 105(e), the statutory acknowledgment of the First Lady's role, is carefully phrased so as *not* to authorize her appointment as an employee or any remuneration for her services. An "unpaid employee" is an oxymoron, although an "unpaid officer" is not. FACA's strictures can be avoided, then, only if it can credibly be argued that Mrs. Clinton is an officer of the Federal Government. I can find no such argument.

To begin with the beginning, the Constitution imposes certain requirements on those who are to serve as officers of the United States. Such persons must be appointed by the President with the consent of the Senate unless Congress, by law, has vested the power of appointment "in the President alone, in the Courts of Law, or in the Heads of Departments," U.S. Const. art. II, § 2, cl. 2. Furthermore, all officers must take an oath to support the Constitution. *Id.*, art. VI, cl. 3. Congress has enacted laws to implement these requirements. *See, e.g.,* 5 U.S.C. § 3331 (officers of the United States required to swear an oath); 5 U.S.C. § 2906 (officers' oath to be "preserved"); 5 U.S.C. § 2902 ("officer[s] appointed by the President" must have commissions made out and sealed by the Secretary of State); 5 U.S.C. §§ 3333, 7311 (anyone who accepts either "office or employment in the Government of the United States" required to swear their loyalty by affidavit). We have received no indication that any of these requirements have been met with regard to Mrs. Clinton.

More generally, an officer implies an office, and an office implies duties. Title 1 of the United States Code defines "officer" by reference to an "office" with "duties"—"'officer' includes any person authorized by law to perform the duties of the office." 1 U.S.C. § 1. And the Supreme Court has interpreted "officer" similarly with reference to the Constitution. In *Burnap v. United States,*

252 U.S. 512, 516, 40 S.Ct. 374, 376, 64 L.Ed. 692 (1920), the Court reasoned: "Whether the incumbent is an officer or an employee is determined by the manner in which Congress has specifically provided for the creation of the several positions, their duties and appointment thereto." *Burnap* held that a "landscape architect" was an employee, not an officer, because "[t]here [was] no statute which creates an office of landscape architect ... nor any which defines the duties of the position," *id.* at 517, 40 S.Ct. at 377, and because "[t]here [was] no statute which provides specifically by whom the landscape architect ... shall be appointed." *Id.*

The undoubted value of the services that the wives of Presidents have rendered their husbands and their country notwithstanding, it cannot be said that they have occupied an office with duties. The provision of the U.S. Code on which the majority relies, 3 U.S.C. § 105(e), is carefully phrased so as *not* to name a position or prescribe duties a President's spouse is to fulfill. In fact, section 105(e), strictly speaking, does not even *authorize* a First Lady to assist the President; rather it authorizes federal employees to assist the First Lady, and, in the course of doing so, *acknowledges* the assistance that First Ladies commonly render their spouses. In sum, Mrs. Clinton carries none of the indicia of a federal officer. She has neither been appointed to nor confirmed in the position of "First Lady," she has taken no oath of office, and she neither holds a statutory office nor performs statutory duties.

Having searched the U.S. Code and the Government's briefs in vain for definitions of "officer" that might give aid and comfort to the Government, I conclude that under any *fair interpretation of the term,* Mrs. Clinton is not an officer of the United States. But to complete this tour through the statute books, I note that section 105(e) does not, as the Government and the majority contend, require a finding that Congress has acknowledged that a President's spouse performs the duties of an officer. Another direct congressional statement on the subject of the First Lady's duties appears in the Anti–Nepotism Act. That Act declares that public officials (expressly including "the President") may

not employ relatives (expressly including a "wife") in "a civilian position in the agency in which he is serving or over which he exercises jurisdiction or control." 5 U.S.C. § 3110(a), (b). The use of the definite article in the phrase "*the* agency in which he is serving" appears to imply that every "public official" belongs to some agency and that their relatives may not be employed in that agency, whatever it happens to be. Moreover, as a matter of policy and consistency, the restrictions on the President under the Anti–Nepotism Act must be viewed to be as broad as the Executive Branch: It is inconceivable that Congress, in combatting nepotism, intended to forbid Mrs. Clinton's service as Attorney General while permitting her appointment as National Security Advisor. Viewed purely as a matter of congressional intent, the argument that the Anti-Nepotism Act applies only to the Departments and not to the White House, *see* Maj. Op. at p. 905, is a weak one. As a result, any gravitational pull exerted in the direction of congressional acceptance of a President's spouse as a "*de facto* officer" attributable to section 105(e) is overwhelmed by the opposite force exerted by the Anti–Nepotism Act.

One final consideration. Although we may assume that, when drafting FACA, Congress gave no thought to the possibility that a President might appoint his spouse to an advisory committee, we may not assume that it failed to contemplate the relationship between FACA and the legal obligations and sanctions imposed on officers and employees of the Federal Government.

As one reviews the affidavit filed with the district court by Ira Magaziner, Senior Advisor to the President for Policy Development, one is struck by the fact that *every* member of the Task Force and Interdepartmental Working Group, but one, was subject to one or more of the statutes that Congress has enacted to ensure the proper conduct of members of the Federal Government—the "insiders," as the Government describes those who qualify as "full-time officers and employees" within the meaning of FACA. These laws impose burdensome ethics requirements. *See, e.g.,* Ethics in Government Act of 1978, 5 U.S.C.App. 6, § 101(f)(3) (1991

Supp.) (applying financial disclosure requirements on all higher paid "officers and employees" in the Executive Branch); *id.* §§ 501(a)(1), 505(2) (1991 Supp.) (applying outside income limitations on all higher paid officers and employees except "special government employees"); 18 U.S.C. § 205 (1991 Supp.) (prohibiting any "officer or employee" from representing outsiders in "matters affecting the Government"); *id.* § 207 (prohibiting anyone who formerly was an "officer or employee" from participating in certain governmental proceedings and decisions after leaving government employment); *id.* § 208 (prohibiting an "officer or employee" from "participat[ing] personally" in a matter affecting "a financial interest"); 5 U.S.C. § 7324 (1988) (prohibiting an "employee in an Executive agency" from taking "an active part" in political campaigns). And even though the Government argues that the Interdepartmental Working Group was not an advisory committee within the meaning of FACA, Mr. Magaziner nevertheless took pains to stress the fact that every member of and consultant to the Group—whether a regular or special government employee, whether working full time or part, for pay or without—was required to file a financial disclosure statement and to comply with other requirements of these laws. *See* Magaziner Affidavit, Gov't App. at 41–43.

These requirements, then, appear as a signal distinction between what would normally be considered to be "inside" and "outside" members of advisory committees. In fact, this distinction—the legal obligations and sanctions imposed on officers and employees of the Government as opposed to private citizens—undoubtedly provides a substantial part of the justification for the very different requirements imposed by FACA on committees that are composed exclusively of federal officers and employees and those that are not. In enacting FACA, Congress found that "[o]ne of the great dangers in the unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns." H.R.Rep. No. 1017, 92 Cong., 2d Sess. 6 (1972), U.S.Code Cong. & Admin.News pp. 3491, 3496. Because committees not composed exclusively of federal

officers and employees have members who are not required to foreswear their private associations and insulate themselves against potential conflicts of interest, FACA requires, as an alternative check, that their deliberations be conducted in the open.

When the majority states that we "need [not] consider whether Mrs. Clinton's presence on the Task Force violates ... any conflict of interest statutes," Maj.Op. at p. 911 n. 10, it indicates that we have not been presented with claims under these statutes that call for adjudication. The question remains, however, whether Congress, if it had ever considered that the President's spouse might be appointed an official member of a Presidential advisory committee, would have labelled her an "officer or employee" within the meaning of FACA. To put it another way, could Congress have intended that Mrs. Clinton, alone of the twelve members of the Task Force and 340 members of the Working Group, would be entirely exempt from the reach of ethics laws that Congress has imposed on the President himself? I think not.

In visiting these sundry provisions, I doubt I have said very much with which my brethren in the majority would disagree. Our disagreement centers, I think, not on Congress's intent in enacting the relevant statutes, but on the lens through which we must view that intent in this particular case. The majority argues (1) that construing the phrase, "officers and employees," to exclude Mrs. Clinton would give rise to weighty constitutional issues, Maj.Op. at p. 910; (2) that the Public Citizen Court avoided deciding similar issues by embracing "an extremely strained construction of the word 'utilized,'" Maj.Op. at p. 906; (3) that "[i]t is reasonable ... to construe section 105(e) as treating the President's spouse as a de facto officer or employee," Maj.Op. at p. 904; and hence (4) that the phrase "full-time officer or employee of the government" must a fortiori be read to apply to Mrs. Clinton, Maj.Op. at p. 911. I remain unconvinced.

First, I do not think that section 105(e) can reasonably be read to create an officer or employee, either de facto or otherwise; and even if it could, I do not think we could avail ourselves of such a reading in this case. I

noted above that section 105(e) has been carefully phrased so as not to recognize an office, an officer, or an employee. But equally important, I know of no case in which the Supreme Court has saved one provision from constitutional difficulty by liberally construing another, entirely unrelated provision. In Public Citizen itself, as well as in every case cited in Public Citizen in which the Court avoided a constitutional challenge, the Court sidestepped the constitutional claims presented through an interpretation of the statute under attack. See Public Citizen, 491 U.S. at 465–66, 109 S.Ct. at 2572 (citing cases); see also id. at 465, 467, 109 S.Ct. at 2572, 2573 (avoiding a constitutional challenge to FACA by construing FACA § 3(2)); see also, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 588, 108 S.Ct. 1392, 1397, 1404, 99 L.Ed.2d 645 (1988) (avoiding a constitutional challenge to the National Labor Relations Act by construing NLRA § 8(b)(4)); St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 780–81, 788, 101 S.Ct. 2142, 2147–48, 2151, 68 L.Ed.2d 612 (1981) (avoiding a constitutional challenge to the Federal Unemployment Tax Act by construing FUTA § 3309(b)). Because it is FACA that is under attack, I think that any additional degree of interpretive freedom we enjoy in construing FACA cannot be extended to a statute authorizing expenditures for White House staff.

Second, I cannot believe that Public Citizen establishes the rule my colleagues tacitly embrace. In reaching their holding, the majority implicitly distinguishes between "extremely strained construction," which, under their reading, Public Citizen permits or even requires, and "disingenuous evasion," which it explicitly forbids. Compare Maj. Op. at p. 906 with 491 U.S. at 467, 109 S.Ct. at 2573. The rule the majority appears to adopt, then, is that judges must strain (but may not evade) the plain meaning of a statute before they may entertain an "as-applied" constitutional challenge. If my colleagues are right, the line between "extremely strained construction" and "disingenuous evasion" will determine the outcome in every case involving an as-applied challenge presenting "for-

midable constitutional difficulties." *Public Citizen*, 491 U.S. at 466, 109 S.Ct. at 2572. While I suspect my colleagues may have some sympathy (as I do) with Justice Kennedy's position that the Supreme Court majority in *Public Citizen* had stretched its interpretation of FACA "beyond the point at which such a construction remains '*fairly possible*,'" *id.* at 481, 109 S.Ct. at 2580 (Kennedy, J., concurring in judgment) (emphasis in original), I cannot believe the Court intended to establish a rule *requiring* such constructions in cases posing serious constitutional questions.

A review of its reasoning demonstrates that *Public Citizen* neither explicitly nor implicitly sanctions "strained" statutory interpretation. Its holding—that the ABA Committee was not "utilized" by the President within the meaning of FACA—was based principally on three considerations. The first of these was that, in the Court's memorable phrase, "'utilize' is a woolly verb," *id.* at 452, 109 S.Ct. at 2565, which necessarily requires judicial definition. Second, it recognized that a "dictionary reading [of the word "utilize" in] FACA's definition of 'advisory committee'" would lead to a statute of "almost unfettered breadth" and produce "absurd results." *Id.* at 452 & n. 8, 452–54, 109 S.Ct. at 2565 & n. 8, 2565–66. Taken literally, FACA's definition would have endowed the President with Midas ears capable of turning any continuing source of consensus opinion into a FACA committee. In such a world, the physicians jointly consulted to protect the President's health, the editorial board of the President's favorite newspaper, and two dietitians jointly planning the President's meals could all be classified as "Presidential advisory committees" subject to regulation. Because "the literal reading of [utilize] would 'compel an odd result,'" the Court "search[ed] for other evidence of congressional intent to lend the term its proper scope." *Id.* at 454, 109 S.Ct. at 2566 (citation omitted). Third, on examining FACA's origins and legislative history, the Court concluded that while "it seems to us a close question whether FACA should be construed to apply to the ABA Committee, ... we are fairly confident it should not." *Id.* at 465, 109 S.Ct. at 2572.

The Court reached this last conclusion in significant part on the basis of the following passage from the FACA Conference Report: "The Act does not apply to persons or organizations which have contractual relationships with Federal agencies *nor to advisory committees not directly established by or for such agencies.*" *Id.* at 462, 109 S.Ct. at 2570 (emphasis added by *Public Citizen*). The Court also noted that the relationship between the ABA Committee and the Justice Department had not fallen within the scope of President Kennedy's Executive Order No. 11007, from which FACA was derived. *Id.* at 462–63, 109 S.Ct. at 2570–71. From this, the Court concluded that "[t]he phrase 'or utilized' therefore appears to have been added simply to clarify that FACA applies to advisory committees established by the Federal Government in a generous sense of that term," *id.* at 462, 109 S.Ct. at 2570; and that "[r]ead in this way, ... the word 'utilize' does not describe the Justice Department's use of the ABA Committee," *id.* at 463, 109 S.Ct. at 2570.

In applying what the majority, Maj.Op. at p. 903, has laconically (and accurately) described as a "rather sweeping" statutory definition of "advisory committee" to the unique relationship between the Justice Department and the ABA Committee, the Court concluded that it was more probable than not that Congress did not intend that FACA apply to such privately organized groups. Nevertheless, because it considered the question close in light of the broad sweep of the definition, literally interpreted, it applied its venerable rule of statutory construction to tip the balance away from one that would have presented "formidable constitutional difficulties." *Id.* at 466, 109 S.Ct. at 2572.

In this case, we deal not with woolly terms but with the meaning of two words in common legal usage, "officer" and "employee." Far from creating absurdity, literal interpretations of these terms are necessary in order to give effect to the congressional policy of drawing sharp distinctions between individuals outside the Government and those within it. And in contrast with *Public Citizen*, in which no statutory definition of "utilize" was

available and great weight was placed on legislative history, definitions of both "officer" and "employee" have been enacted into law by Congress. In this case, none of the considerations animating *Public Citizen* are remotely presented; and because we do not deal with ambiguous terms, there is no "balance" to be tipped by resort to legal maxims. Despite appearances, *Public Citizen* has little to do with the case we decide today.

Finally, to conclude my statutory analysis, I note that the *Nixon I* Court engaged in a patently straightforward interpretation of Federal Rule of Criminal Procedure 17(c), 418 U.S. at 697–702, 94 S.Ct. at 3102–3104, even though it recognized that "[i]f we sustain[ ] this challenge, there [will] be no occasion to reach the claim of privilege asserted." *Id.* at 698, 94 S.Ct. at 3102. Needless to say, the considerations counseling avoidance of difficult constitutional issues were never more pressing than on the facts of *Nixon I.* Because I can find no credible argument to the contrary, and because I cannot bring myself to strain the meaning of "officer" or "employee" to produce one, I would hold that the Task Force was not exempt from the public disclosure requirements of FACA; and having done so, I would address the constitutional implications of that holding.

As I pointed out earlier, the Supreme Court has acknowledged a Presidential right to confidentiality that "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon I,* 418 U.S. at 708, 94 S.Ct. at 3107. Although the privilege is not absolute, the Court has only twice found that it must yield to competing constitutional interests, such as "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions," *id.* at 707, 94 S.Ct. at 3107; and in each case, it has protected the confidentiality of Presidential communications from unwarranted disclosure.

In *Nixon I,* in which President Nixon sought to enjoin the subpoenaing of certain of his papers, the Court found it necessary to weigh the importance of the general principle of confidentiality of Presidential communications in performance of the President's responsibilities against the inroads of such a privilege on the fair administration of criminal justice.

*Id.* at 711–12, 94 S.Ct. at 3109. It concluded that the President's "generalized interest in confidentiality ... cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice." *Id.* at 713, 94 S.Ct. at 3110. Accordingly, it ordered the examination *in camera* of the papers subject to an instruction that the district court be scrupulous in "protect[ing] against any release or publication of material not found by the court [to be] probably admissible in evidence and relevant to the issues of the trial for which it is sought." *Id.* at 714, 94 S.Ct. at 3111.

*Nixon II* involved a balancing of the President's interest in the confidentiality of his communications against other national interests. In that case, former President Nixon asserted the Presidential privilege in a challenge to the constitutionality of the Presidential Recordings and Materials Preservation Act, which placed his papers in the custody of the Administrator of General Services. *See* 433 U.S. at 429–30, 97 S.Ct. at 2783–84. The Supreme Court found that the statute was constitutional because of the Nixon papers' historical importance and their possible significance as aids to the legislative process, and because of "the safeguards built into the Act to prevent disclosure of [confidential] materials and the minimal nature of the intrusion into the confidentiality of the Presidency." *Id.* at 454, 97 S.Ct. at 2796. Those safeguards included the requirement that "any party's opportunity to assert any ... constitutionally based right or privilege" be protected. *Id.* at 450, 97 S.Ct. at 2793 (quoting section 104 of the Act). The Court concluded "that the screening process contemplated by the Act [, which was to be conducted by Executive Branch archivists,] ... will not constitute a more severe intrusion into Presidential confidentiality than the *in camera* inspection by the District Court approved in [*Nixon I* ]." *Id.* at 455, 97 S.Ct. at 2796.

In these two cases, the Court permitted only the most limited intrusions on the privilege. FACA, by contrast, would have required that the Task Force operate in the full glare of provisions requiring public meet-

ings and disclosure of records. It is hard to imagine conditions better calculated to suppress the "candid, objective, and even blunt or harsh opinions," *Nixon I*, 418 U.S. at 708, 94 S.Ct. at 3107, that the President was entitled to receive from the twelve advisors he had appointed to his Task Force. Because none of Congress's purposes in enacting FACA are of a gravity that would justify overriding the Presidential privilege in this case, I would conclude that FACA is unconstitutional as applied to the Task Force.

For the foregoing reasons, I concur only in the majority's conclusion, in Part III of its opinion, that FACA's public disclosure provisions may not be applied to the Task Force. With respect to Part IV, I agree that the district court must develop further facts before it can determine whether the Working Group, or any division thereof, qualified as an advisory committee under FACA.