# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 12, 2020                    Decided April 30, 2021

No. 19-5238

ELECTRONIC PRIVACY INFORMATION CENTER,
APPELLANT

v.

DRONE ADVISORY COMMITTEE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00833)

*John L. Davisson* argued the cause for appellant. With him on the briefs were *Marc Rotenberg* and *Alan Butler*.

*Joseph F. Busa*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Mark B. Stern*, Attorney. *Sarah Carroll*, Attorney, entered an appearance.

Before: HENDERSON, WILKINS, and KATSAS, *Circuit Judges*.

Opinion of the Court filed by *Circuit Judge* KATSAS.

2

Opinion concurring in part and dissenting in part filed by *Circuit Judge* WILKINS.

KATSAS, *Circuit Judge*: The Federal Advisory Committee Act applies to any committee or subcommittee established or utilized by a federal agency to obtain advice. Section 10(b) of FACA requires a covered advisory committee to make publicly available any records prepared for or made available to it.

This case involves four subgroups of the Drone Advisory Committee (DAC), which provided advice to the Federal Aviation Administration. The subgroups—one subcommittee and three task groups—provided advice to the DAC, but never directly to the FAA. The question presented is whether section 10(b) of FACA applies to records that these subgroups created but never provided to the DAC. It turns on two subsidiary questions: (1) whether the subgroups were themselves FACA advisory committees; and (2) even if not, whether the disclosure requirement nonetheless extends to the disputed subgroup records. We answer no to both questions.

I

A

As its name suggests, FACA regulates committees that provide advice to the federal government. As relevant here, section 3(2) of FACA defines the term "advisory committee" to cover "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof" that is "established or utilized by" the President or a federal agency "in the interest of obtaining advice or recommendations for" the President or the agency. 5 U.S.C. app. 2 § 3(2). The definition excludes committees composed entirely of federal officers or employees. *Id.*

FACA imposes various requirements on covered advisory committees. Each committee must have a charter specifying its purpose, duties, budget, and timeline for completing its work. 5 U.S.C. app. 2 § 9(c). The sponsoring agency must designate a federal officer or employee "to chair or attend each meeting of the advisory committee," *id.* § 10(e), and the committee may not "hold any meetings except at the call of, or with the advance approval of," that official, *id.* § 10(f). Membership of the committee must be "fairly balanced in terms of the points of view represented," *id.* § 5(b)(2), and the committee, in formulating "advice and recommendations" for the agency, must exercise "independent judgment" not "inappropriately influenced by the appointing authority or by any special interest," *id.* § 5(b)(3). The committee must open its meetings to the public, *id.* § 10(a); keep detailed minutes of each meeting, *id.* § 10(c); and make various of its records available to the public, *id.* § 10(b). Each committee may have "adequate staff." *Id.* § 5(c).

Section 10(b) of FACA imposes the public-records requirement. It provides that, subject to exemptions set forth in the Freedom of Information Act,

> the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

5 U.S.C. app. 2 § 10(b).

FACA authorizes the Administrator of General Services to prescribe "administrative guidelines and management controls

applicable to advisory committees." 5 U.S.C. app. 2 § 7(c). Under this authority, the General Services Administration has promulgated several regulations on how FACA applies to subcommittees. One provides: "In general, the requirements of the Act … do not apply to subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency." 41 C.F.R. § 102-3.35(a). Another states: "The creation and operation of subcommittees must be approved by the agency establishing the parent advisory committee." *Id.* § 102-3.35(b). Moreover, "for each advisory committee and its subcommittees," the same designated federal official must "[a]pprove or call the meeting of the advisory committee or subcommittee" and must "[a]ttend the meetings" of both. *Id.* § 102-3.120.

B

The FAA established the Drone Advisory Committee to obtain advice on the use of drones in the national airspace. The FAA instructed the DAC to "provide the FAA with recommendations" and to "deliberat[e]" on any proposed recommendations in "meetings that are open to the public." J.A. 72. The Deputy Administrator of the FAA became the designated federal official for the DAC.

The FAA provided for subgroups to support the DAC's activities. The "terms of reference" for the DAC—its key organic document—established a subcommittee as "Staff to Advisory Committee." J.A. 73. The DAC was required to "[d]irect the work" of the subcommittee, which was required to "[f]orward recommendations and other deliverables to the DAC for consideration." J.A. 72–73. The terms of reference also authorized the DAC to establish task groups "to develop recommendations and other documents for the Committee." J.A. 72. Each task group would address a "specific" aspect of

drone policy. *Id.* Task-group products would either be presented to the subcommittee "for review and deliberation, then forwarded to the DAC" or would be "presented directly to the DAC." *Id.*

The subcommittee had its own terms of reference. They reiterated that its purpose was to "support the DAC" and "provide the staff work for the DAC," by giving "input to the DAC" for its "development of recommendations to be forwarded to the FAA." J.A. 102. The terms of reference permitted FAA personnel to "take part in" the subcommittee's deliberations. J.A. 105. But they specifically, repeatedly, and emphatically forbade the subcommittee from sending any recommendations directly to the FAA: "All must be vetted in a public DAC meeting and transmitted to the FAA upon approval by the DAC." J.A. 104; *see also* J.A. 106 ("nor can the [subcommittee] make recommendations directly to the FAA").

The DAC eventually created three task groups: one to assess government regulation of drones; one to assess access requirements for drones; and one to assess drone funding. As with the subcommittee, terms of reference specifically forbade the task groups from submitting recommendations "directly to the FAA." J.A. 104.

The subcommittee and task groups delivered progress reports and draft recommendations to the DAC at three of its meetings in 2017 and 2018. After extended back-and-forth between the DAC and its subgroups, the DAC adopted a final set of recommendations and presented them to the FAA. On May 29, 2018, the DAC's charter expired and it ceased to exist.

C

In March 2018, the Electronic Privacy Information Center (EPIC) requested records related to the DAC from various

agency and advisory-committee officials. EPIC sought all documents "made available to or prepared for or by the DAC or any DAC subcomponent." J.A. 63 (cleaned up). After receiving no response, EPIC sued to obtain the records. It alleged that the government had violated section 10(b) of FACA by failing to disclose the records.

The government moved to dismiss EPIC's complaint, and the district court granted the motion in part and denied it in part. The court held that because the DAC was an "advisory committee" within the meaning of FACA, EPIC had stated a claim with respect to DAC documents—*i.e.*, documents "made available to or prepared for or by" the DAC itself. *EPIC v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 42, 47–49 (D.D.C. 2019) (cleaned up). But, the court held, neither the subcommittee nor any of the task groups was itself a covered advisory committee. *Id.* at 44–47. And section 10(b) applied only to the records of the DAC itself—not to the records of the subcommittee or the task groups. *Id.* at 41–43.

After the government disclosed various DAC documents, EPIC moved for entry of final judgment. The district court granted the motion, and EPIC appealed. We have jurisdiction under 28 U.S.C. § 1291, and our review is *de novo, Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020).

## II

EPIC contends that the subcommittee and task groups were themselves advisory committees under FACA, which would make their respective records disclosable under section 10(b). This theory is inconsistent with the text of FACA, governing GSA regulations, and our precedent.

7

A

Section 3(2) of FACA defines what kind of groups the statute covers. In pertinent part, it provides: "The term 'advisory committee' means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof" that is "established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for ... one or more agencies." 5 U.S.C. app. 2 § 3(2). This definition turns on the existence of an advisor/advisee relationship between the committee giving advice and the agency receiving it—the agency must establish or utilize the committee to obtain advice *for the agency*. FACA's substantive requirements confirm that advisory committees report to sponsoring agencies. For example, the charter of an advisory committee must identify the "agency or official to whom the committee reports," *id.* § 9(b); the records of an advisory committee must be publicly available at its offices or those of "the agency to which the advisory committee reports," *id.* § 10(b); and "the head of the agency to which the advisory committee reports" may close committee meetings under certain circumstances, *id.* § 10(d). Under these provisions, a covered committee advises and reports to the agency; one advisory committee does not simply advise and report to another.

Section 3(2) reinforces this point in its treatment of subcommittees. It provides that a "subcommittee" is a covered advisory committee only if it independently satisfies the statutory definition—the subcommittee itself must be established or utilized by an agency to obtain advice for the agency. Section 3(2) does not provide that if a group is a covered advisory committee, then so too are its subgroups. Thus, we have long recognized that the question whether a group meets the definition of an "advisory committee" is

distinct from the question whether any of its subgroups meets the definition. *Metcalf v. Nat'l Petroleum Council*, 553 F.2d 176, 177 n.13 (D.C. Cir. 1977). And given the textual and structural features of FACA discussed above, FACA cannot cover a subcommittee merely because it advises a parent committee that in turn advises an agency. That would convert any subcommittee into an advisory committee and collapse the distinction between reporting to an agency and merely reporting to a parent committee.

GSA regulations confirm that FACA coverage turns on whether a subcommittee directly advises the agency. One regulation provides: "In general, the requirements of the Act … do not apply to subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency." 41 C.F.R. § 102-3.35(a). But "[i]f a subcommittee makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee, then the subcommittee's meetings must be conducted in accordance with all openness requirements" of FACA. *Id.* § 102-3.145. Under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), these regulations constitute "a body of experience and informed judgment to which courts and litigants may properly resort for guidance," *id.* at 140.

Our precedent confirms that FACA does not apply to subgroups that merely provide advice or recommendations independently evaluated by a parent advisory committee. In *National Anti-Hunger Coalition v. Executive Committee of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071 (D.C. Cir. 1983), we held that task forces advising an advisory committee, but "not providing advice directly to the President or any agency," were not covered advisory committees. *Id.* at 1075 (cleaned up). Then, in *Association of*

*American Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898 (D.C. Cir. 1993) (*AAPS*), we confirmed that FACA applies to the group that "gives the advice to the government," but not to the "subordinate advisers or consultants who are presumably under the control of the superior groups." *Id.* at 913. Both decisions are instructive.

In *Anti-Hunger Coalition*, the plaintiffs sought records from three task forces reporting to two presidential advisory committees. 711 F.2d at 1072. The district court held that FACA does not apply to task forces or other subgroups that "do not directly advise the President or any federal agency," even if they "provide information and recommendations" to advisory committees. *Nat'l Anti-Hunger Coal. v. Exec. Comm. of the President's Priv. Sector Survey on Cost Control*, 557 F. Supp. 524, 528–29 (D.D.C. 1983). The court described such subgroups as merely "performing staff functions" for the parent committee. *Id.* at 529. On summary judgment, the court held that because the task forces at issue did not directly advise the President or any agency, they were not covered advisory committees. *Id.* at 529–30. In affirming, this Court explicitly "approve[d] the reasoning under which the District Court rejected the appellants' contentions"—including the contention that the "task forces [were] themselves advisory committees." 711 F.2d at 1072. We noted that a task force or other subgroup might itself be an advisory committee only if it transmitted material "directly to federal decision makers" or if the parent committee approved its recommendations "with little or no independent consideration." *Id.* at 1075.[1]

---

[1] The dissent contends that *Anti-Hunger Coalition* has limited precedential value because, in its view, the only issue necessary to our decision was whether to consider new evidence that the task forces transmitted recommendations directly to the government or that the parent committee rubber-stamped task force

10

In *AAPS*, we continued to distinguish between advisory committees and their subordinate groups. *AAPS* involved a "working group" that reported and gave advice to a "Task Force" on healthcare reform. 997 F.2d at 901. Applying *Anti-Hunger Coalition*, the district court held that because the Task Force was an advisory committee, the working group was not. *See id.* at 913. We held that the Task Force consisted entirely of government officials and thus was exempt from FACA. *Id.* at 902–11. As a result, we further held that the working group *was* an advisory committee because *it* was "the point of contact between the public and the government." *Id.* at 913. We contrasted the working group in *AAPS* with the task forces in

recommendations. *Post* at 12–13. But before holding that the new evidence was not properly before us, we concluded that the district court's "characterization of the task forces as the [Advisory] Committee's 'staff'"—rather than as separate advisory committees—was "perfectly defensible" on the record before it. *See* 711 F.2d at 1075–76. Moreover, the appellants in *Anti-Hunger Coalition* had devoted an entire section of their brief to challenging the directness requirement imposed in that case. *See* Brief of Appellants at 25–34, *Nat'l Anti-Hunger Coal.*, 711 F.2d 1071 (No. 83-1248), *microformed on* Records and Briefs of the U.S.C.A., D.C. Circuit (BNA's Law Reprints); *id.* at 30 ("FACA simply does not distinguish between groups which render advice directly to federal decisionmakers and those which furnish advice 'indirectly.'"). And our suggestion that the plaintiffs seek relief in the district court based on the asserted new evidence, 711 F.2d at 1076, would have made little sense if the task forces were advisory committees regardless of whether their recommendations flowed to the government directly or indirectly. The dissent further questions whether the task forces in *Anti-Hunger Coalition* "were even providing advice." *Post* at 14. We described them as providing "reports and recommendations," 711 F.2d at 1072, 1075—which, for FACA purposes, is indistinguishable from providing advice, *see* 5 U.S.C. app. 2 § 3(2) (by definition, advisory committees provide "advice or recommendations").

*Anti-Hunger Coalition*, which reported to parent advisory committees "covered by FACA." *Id.*

EPIC highlights our observation in *AAPS* that "the President can establish an advisory group that he does not meet with face-to-face." 997 F.2d at 912. But we said that to reinforce the point that FACA coverage turns on which entity is the "point of contact" between the public and the government. *See id.* at 912–13. Because the working group in *AAPS* provided advice directly to "one or more agencies or officers of the Federal Government," 5 U.S.C. app. 2 § 3(2), even if not directly to the President, it qualified as an "advisory committee" under FACA.

Under these decisions, the subgroups here do not qualify as advisory committees. EPIC attached to its complaint the organic documents of the DAC and its subgroups, as well as the minutes of each DAC meeting. Those documents show that the subgroups gave recommendations to the DAC over the course of three DAC meetings. They also show that members of the DAC engaged in extensive give-and-take with the subgroups, as well as extensive deliberations among themselves, before adopting any recommendations and conveying them to the FAA. Indeed, the minutes reveal that the DAC insisted on refinements or amendments to subgroup recommendations before adopting them. Because the subgroups advised and reported to the DAC—not to the FAA—they were not advisory committees.[2]

---

[2] The dissent contends that dismissal at the pleading stage is inappropriate because EPIC has plausibly alleged that the DAC acted as a rubber-stamp. *Post* at 15–17. But the DAC meeting minutes—attached and thus incorporated into EPIC's own complaint—conclusively rebut that allegation. *See*, *e.g.*, J.A. 141 (DAC orders task group to "adjust" preliminary recommendation); *id.* (DAC

B

EPIC contends that the subcommittee and task groups satisfy FACA's definition of an advisory committee for three principal reasons. None is persuasive.

*First*, EPIC highlights an FAA press release stating that the DAC would conduct some of its business "through a subcommittee and various task groups that would help the FAA prioritize its activities." J.A. 80. But whether subgroups might indirectly help the FAA is not the relevant question; as explained above, a subgroup must directly advise the agency in order to be an advisory committee under FACA. And as the organic documents and meeting minutes confirm, none of the subgroups here did so.

*Second*, EPIC argues that the subgroups must have directly advised the FAA because the DAC's designated federal official attended subgroup meetings and thus learned of subgroup recommendations before the DAC could consider them. But FACA itself required the designated official to attend each meeting of the DAC, 5 U.S.C. app. 2 § 10(e), and the GSA

___

orders task group to "re-look" at issue and give it "more attention"); J.A. 143 (DAC requests updates "to make sure [task groups] are going in the 'right direction'"); J.A. 148 (task group "has incorporated guidance received from" DAC); J.A. 161–63 (DAC deliberation over "non-consensus" task-group proposals); J.A. 164 (task group noting "iterative process" with DAC); J.A. 165–67 (DAC votes to adopt "clarifying amendment" to task group recommendation). The further allegation that FAA officials "worked directly with the Subcommittee," *post* at 16, also does not help EPIC. As elaborated in the complaint, it sets forth what nobody denies— that FAA officials briefed the subcommittee on its assignments and attended its meetings. J.A. 51. None of this supports a plausible inference that the subgroups secretly conveyed advice directly to the FAA, in violation of their own organic documents.

regulations likewise required that same official to attend each meeting of the subgroups, 41 C.F.R. § 102-3.120. Moreover, the regulations codify our holding in *Anti-Hunger Coalition* that FACA does "not apply to subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency." 41 C.F.R. § 102-3.35(a); *see* 66 Fed. Reg. 37,728, 37,729 (July 19, 2001) (discussing *Anti-Hunger Coalition*). So the mere presence of the designated official at committee or subgroup meetings, as required by the statute and its implementing regulations, cannot transform a subgroup into an advisory committee.

EPIC stresses that the designated federal official for the DAC was a high-ranking officer of FAA—at various times, either the Deputy Administrator or the Acting Administrator. In other contexts, the distinction between high-ranking officers and low-ranking employees may be important. *See*, *e.g.*, *Lucia v. SEC*, 138 S. Ct. 2044, 2051–57 (2018) (Appointments Clause). But FACA permits any federal "officer or employee" to be designated as the government official who must call and attend meetings of the advisory committee. 5 U.S.C. app. 2 § 10(e), (f). And although the rank of the designated official may reflect the importance of the committee's work to the agency, *post* at 9–10, what matters under *Anti-Hunger Coalition* and *AAPS* is whether the subgroup transmits any recommendations directly to the agency—either formally or in substance because the parent committee acts as a rubber-stamp. *See* 997 F.2d at 913; 711 F.2d at 1075–76.

*Third*, EPIC contends that the DAC subgroups are covered advisory committees because the FAA established them and exercised sufficient control to "utilize" them within the meaning of FACA. *See*, *e.g.*, *Pub. Citizen v. DOJ*, 491 U.S. 440, 457–59 (1989); *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1450–51 (D.C. Cir. 1994). But even if

the FAA did establish and utilize the subgroups, that would not make them advisory committees. Again, section 3(2) covers only those committees established or utilized "in the interest of obtaining advice for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. app. 2 § 3(2). To avoid significant statutory surplusage, the latter phrase must mean more than just that the FAA established or utilized the subgroups. The inquiry for this further element of the definition— distinguishing groups that make recommendations directly to the federal government from those that merely make recommendations to advisory committees—is spelled out in *Anti-Hunger Coalition* and *AAPS*, not in decisions addressing when the government establishes or utilizes the group at issue.

C

In a similar vein, the dissent argues that a subgroup whose recommendations will "benefit" the agency is established or utilized to obtain recommendations "for" the agency. *Post* at 2. Relying on *California Forestry Association v. United States Forest Service*, 102 F.3d 609 (D.C. Cir. 1996)—which neither party cited—the dissent contends that a group provides recommendations "for" an agency if "the agency formed the group and intended for the group's advice to serve an essential element of the agency's mission." *Post* at 2 (cleaned up). To the dissent, at least if the agency creates the subgroup, all that matters is whether the subgroup's advice is "intended to benefit [the] agency" directly or indirectly. *Post* at 9.

*California Forestry* does not support that view. The case involved a committee established by the Forest Service to study old-growth forests in the Sierra Nevada. The Service paid for the study out of funds appropriated for "forest research." *See* 102 F.3d at 610. The committee provided the study to the Service, which used the study in many of its operations. *See*

*id.* at 611–12. On these facts, we had no difficulty concluding that the committee was established and utilized to provide advice "for" the Forest Service, despite legislative history indicating that Congress wanted the Service to fund the study, *see id.* at 610–11, and wanted to receive it, *see id.* at 612 n.3. *California Forestry* thus involved no question whether FACA covers subordinate groups that report to federal agencies only through parent advisory committees. Yet if anything, the decision makes our point: FACA covered the committee at issue based on its direct reporting relationship to the Forest Service. And no countervailing "intent" from the legislative history mattered, despite even a statement in the House Report declaring that FACA would not apply to the group conducting the study. *See id.* at 612.

The dissent's attempt to replace a directness test with an intent test has other difficulties as well. For one thing, it would sweep into FACA virtually all subgroups established by the government, for it is hard to imagine why an agency would create subgroups unless it intended to benefit from their efforts. And an intent test would do this even where, as here, the sponsoring agency forbade the subgroups from providing advice directly to it and instead required them to operate at the bottom of a carefully defined hierarchy. In any large organization, executives make decisions supported by staff with more specialized knowledge about one or another aspect of the question at hand. The FAA constituted the DAC with this reality in mind, by establishing a parent committee "comprised of executive leaders" from key stakeholders and supported by subgroups "comprised of members with broad knowledge and expertise" of one or another aspect of drone policy. J.A. 72. Yet on the dissent's view, the price for doing this was to trigger each of FACA's substantial constraints—ranging from chartering obligations to balanced-membership requirements—for each of the specialized task groups two or

three levels removed from the agency itself. As shown above, nothing in FACA compels that odd result.[3]

Because the subgroups here provided no advice to the FAA directly, and because the DAC functioned as more than a rubber-stamp for the subgroups' work product, the subgroups were not advisory committees subject to FACA.

## III

EPIC next contends that even if the subcommittee and task groups were not themselves advisory committees, their records nonetheless are DAC records covered by section 10(b) of FACA. Again, we disagree.

Section 10(b) requires the disclosure of records "made available to or prepared for or by each advisory committee." 5 U.S.C. app. 2 § 10(b). It is undisputed that records created by the subgroups and given to the DAC became DAC records that must be disclosed. The district court ordered the government to give those records to EPIC, *see* 369 F. Supp. 3d at 47–49, and the government has complied. The present dispute thus involves only records created by the subgroups and never given to the DAC—for example, drafts of proposals that died before the subgroups or minutes of subgroup meetings. Such records

---

[3] To mitigate the practical difficulties of its approach, the dissent posits that a federal agency could establish subgroups to provide an advisory committee with "staffing work" but not "advice or recommendations." *Post* at 17–18. But one critical function of staff is to advise their principals—the Chief of Staff advises the President, Capitol Hill staffers advise Members of Congress, and chambers staff (*i.e.*, law clerks) advise judges. And where the sole job of the principals is to *give advice*—as for members of an advisory committee—it is particularly difficult to imagine their receiving much help from advice-free staffing.

were neither "made available to" nor "prepared for or by" the DAC. Instead, under the same line of reasoning adopted above, we think that such records were "prepared for or by" the subgroups themselves.

EPIC counters with the dictionary. It contends that because a "subgroup" is a "subdivision of a group," *Subgroup*, *Collins English Dictionary* (2018), records belonging to a subgroup must also belong to the group. That contention overlooks specific usage in FACA, which defines "advisory committee" to include some, but not all subgroups of covered committees. 5 U.S.C. app. 2 § 3(2). Likewise, it overlooks FACA's elaboration of what records must be disclosed—those made available to, prepared for, or prepared by a covered advisory committee. *Id.* app. 2 § 10(b). Because FACA's text contemplates subgroups that are not advisory committees, as well as documents prepared for subgroups but not for advisory committees, ordinary usage does not help EPIC.

EPIC also invokes FACA's implementing regulations. It asserts that the regulations distinguish between advisory committees and subgroups for purposes of FACA's open-meeting requirement, but not for purposes of its record-disclosure requirement. The cited open-meeting regulations simply track our analysis of when subcommittees are advisory committees: no FACA requirements apply to subcommittees that report only to a parent advisory committee, 41 C.F.R. § 102-3.35, but open-meeting requirements apply "[i]f a subcommittee makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations," *id.* § 102-3.145. And the record-disclosure regulation describes section 10(b) as covering records that "provide a meaningful opportunity to comprehend fully the work undertaken by the advisory committee," *id.* § 102-3.170, which

does not cover records neither generated by the committee nor provided to it.  The GSA regulations do not help EPIC.[4]

EPIC highlights a schedule issued by the National Archives and Records Administration, which requires subcommittee records to be preserved under the Federal Records Act.  *See* General Records Schedule 6.2: Federal Advisory Committee Records 131–32 (Sept. 2016).  The schedule reflects the Archivist's view of which documents "have sufficient administrative, legal, research, or other value to warrant their further preservation."  44 U.S.C. § 3303a(d).  That determination tells us nothing about which records of a subgroup are "prepared for or by" its parent advisory committee within the meaning of section 10(b).  We have already held that "the treatment of documents for disposal and retention purposes under the various federal records management statutes" does not determine the documents' status under the Freedom of Information Act.  *Consumer Fed'n of Am. v. USDA*, 455 F.3d 283, 289 (D.C. Cir. 2006) (cleaned up).  Nor should it determine their status under FACA.

EPIC also analogizes to FOIA.  It notes that agency records subject to FOIA include records of agency components; for example, records of the Civil Division are also records of the Justice Department.  According to EPIC, the same principle should govern the respective records of parent

---

[4]  EPIC further points to a single slide from an undated GSA "Training Course," which announces that subcommittees must allow public access to their records.  J.A. 188.  The slide further states that subcommittees must comply with other FACA requirements such as designating a federal officer and keeping minutes of meetings.  Whatever its origin, the slide lacks the force of law, and it plainly contradicts the regulation confirming that many subcommittees are not subject to FACA.  *See* 41 C.F.R. § 102-3.35(a).

advisory committees and their subgroups. But the comparison is inapt. FOIA disclosure requirements extend to the records of any federal "agency," which FOIA defines as "each authority" of the federal government, including those "within or subject to review by another agency." 5 U.S.C. § 551(1); *see id.* § 552(f)(1). In contrast, as we have shown, FACA defines some subgroups not to be covered advisory committees, and it limits disclosure obligations to the records "made available to or prepared for or by" a covered advisory committee. EPIC's invocation of FOIA, like its invocation of the Federal Records Act, does not advance its case.

Finally, EPIC cites *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999), for the proposition that section 10(b) can cover documents not made available to the entire advisory committee. But *Cummock* held only that section 10(b) gave one member of an advisory committee the right to access documents "reviewed and relied upon" by other members of the committee "in formulating [their] recommendations." *Id.* at 292. It says nothing about the character of records produced and held by an advisory committee's distinct subgroups.

IV

For these reasons, we hold that the DAC subgroups were not themselves advisory committees and that section 10(b) of FACA does not extend to documents that the subgroups created but never gave to the DAC.

*Affirmed.*

WILKINS, *Circuit Judge*, concurring in part and dissenting in part: "Sunlight is said to be the best of disinfectants." *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (quoting L. BRANDEIS, OTHER PEOPLE'S MONEY 62 (National Home Library Foundation ed. 1933)). With this principle in mind, Congress passed the Federal Advisory Committee Act, 5 U.S.C. app. 2, *et seq.*, out of a recognition that advisory committees "were often dominated by representatives of industry and other special interests seeking to advance their own agendas." *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999). FACA requires, among other things, that advisory committees hold open meetings, keep detailed minutes, and make their records available to the public. *See* 5 U.S.C. app. 2 § 10; *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 446 (1989). The plaintiff, Electronic Privacy Information Center ("EPIC"), alleges that the Federal Aviation Administration ("FAA") organized the Drone Advisory Committee ("DAC") in a way that evades this scrutiny, allowing industry insiders such as Amazon, Facebook, and Chinese drone manufacturers to deliberate and develop policy recommendations in secret subcommittee meetings.

EPIC wants to know whether these stakeholders exercised outsized influence over the subgroups' deliberations. The majority prevents that, holding that a subgroup established *by* an agency for the purpose of developing advice *for* the agency may shield from public view its meetings and records, so long as the advice first passes through a FACA committee. In other words, the subgroups need not comply with FACA, because their chartering documents set forth a procedure by which their recommendations are filtered through a FACA committee, and their recommendations are not given "directly to" to the FAA. *See* Maj. Op. at 8 (citing *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 711 F.2d 1071 (D.C. Cir. 1983)). For several reasons, I disagree.

First, the plain text of the statute and our precedent applying it compel the conclusion that these subgroups are FACA committees. Relevant here, FACA defines "advisory committee" to include groups that are established to provide advice "for" a government agency. 5 U.S.C. app. 2, § 3(2)). FACA's reach is not limited to groups that provide advice "directly to" an agency. Instead, the word "for" in this context mostly sensibly means that the advice must *benefit* the agency. And whether a group's advice is obtained "for" the government cannot be untethered from the question of who established that group and why.

Consistent with this understanding, under our precedent we look not to the *manner* in which a group offers its advice, but rather to whether the entity that established or utilized the group (be it Congress, the President, or an agency) intended for the group's advice to benefit the President, an agency, or an officer of the federal government. *California Forestry Association v. U.S. Forest Service*, 102 F.3d 609, 611–12 (D.C. Cir. 1996). Specifically, we have held that a group was established in the interest of obtaining advice "for" an agency, even though the group delivered its advice directly to Congress (who was the "*primary* intended recipient" of the advice), because the agency formed the group and intended for the group's advice to "serve an essential element of" the agency's mission. *Id.* Here, according to the enabling documents appended to the complaint, the FAA intended for the subgroups to provide advice that would assist it in developing airspace policy. On that basis alone, they are FACA committees. *See id.* at 611 ("We conclude that the circumstances of SNEP's genesis support an inference that SNEP was in fact established 'in the interest of' of advising an agency and therefore is subject to FACA.").

3

Second, the majority's reliance on *Anti-Hunger*, 711 F.2d at 1075–76, is misplaced for many reasons. Foremost among them is that *Anti-Hunger* has little, if any, precedential application here, as we merely rejected an evidentiary challenge to the district court's decision. Moreover, even assuming *Anti-Hunger* adopted the district court's reasoning, that case involved subgroups that were created by the FACA committee and performed mere "staff" functions. *Id.* By contrast, the subgroups here were created by *the FAA*, and the enabling documents require the subgroups to *provide advice*. Finally, even assuming this case sits on all fours with *Anti-Hunger*, EPIC has plausibly alleged that the subgroups exceeded the scope of their mandates and "directly" advised the FAA, because the DAC allegedly "rubber stamp[ed]" the subgroups' recommendations. *Id.*

At the heart of this dispute is EPIC's concern that the DAC's recommendations to the FAA failed to address the privacy concerns surrounding unmanned aircraft, or "drones."

The FAA established the DAC under FACA to "provide advice on key unmanned aircraft integration issues." J.A. 77. Despite the serious and obvious privacy concerns that drones present,[1] the DAC's membership was allegedly stacked with industry representatives and included no representation from groups dedicated to protecting Americans' privacy.[2]

---

[1] Drones can observe and record all kinds of sensitive information about Americans from thousands of feet in the air, unbeknownst to those on the ground who are being surveilled. *See* J.A. 48 ¶ 19.

[2] According to the complaint, eighteen DAC members "are affiliated with corporations or organizations engaged in the design, manufacture, operation, or management of drones," nine "are affiliated with traditional aircraft operators, airport authorities, or associations of aviation professionals," two "are university-affiliated researchers," and three "are public officials." J.A. 50 ¶ 27. But "[n]o

4

Compounding this concern is the DAC's structure, which provides that recommendations flow from "task groups," which report to the DAC's subcommittee (the "DACSC"), which in turn reports to the DAC. Unlike the DAC, however, the DACSC and the task groups meet in secret and do not disclose the agendas or minutes from their meetings. Wishing to learn how much (if at all) privacy issues animated the subgroups' discussions, EPIC requested their records and, after receiving no response, filed suit. But the District Court granted the government's motion to dismiss EPIC's claims against the subgroups, concluding that they are not "advisory committees" under FACA.

I turn now to the text.

FACA provides that some "subcommittee[s]" or "task force[s]" are to be treated as "advisory committee[s]" subject to FACA's requirements. 5 U.S.C. app. 2 § 3(2). To be considered an "advisory committee" under FACA, the subgroup must have been:

> **(A)** established by statute or reorganization plan, or
> **(B)** established or utilized by the President, or
> **(C)** *established or utilized by one or more agencies*,
>
> *in the interest of obtaining advice or recommendations for* the President *or one or more agencies* or officers of the Federal Government . . . .

---

privacy, consumer safety, or other general public interest groups are represented on the DAC." *Id.*

*Id.* (emphasis added).

Parsing out the relevant text, the question here is (1) whether the FAA "established or utilized" the subgroups, and (2) whether the FAA did so "in the interest of obtaining advice or recommendations for" the FAA. *See id.* But the second prong cannot be viewed in isolation from the first. That is, the phrase "in the interest of obtaining advice or recommendations for" modifies the phrase "established or utilized." While the first prong merely asks *who* established or utilized the group, the second prong asks *why* the group was established. And the second question cannot be answered without considering who did the establishing or utilizing, and their reason for doing so.

As to the first prong, the government has explicitly waived any argument against it.[3] This waiver is unsurprising, as no one can seriously dispute that the subgroups were "established" by the FAA. *See Byrd v. EPA*, 174 F.3d 239, 246 (D.C. Cir. 1999) ("[A]n agency 'establishes' a [FACA] committee only if the agency forms the committee[.]"). The FAA specifically called for the subgroups' creation in the DAC's Terms of Reference, J.A. 72 (providing that the DAC will "be two-tiered

---

[3] Despite EPIC's briefing on the question below, *see* Pl.'s Opp'n to Mot. to Dismiss (ECF No. 18, at 21–23), the District Court did not address whether the subgroups were "established" by the FAA. *See* J.A. 30 n.4. And even though EPIC briefed the question extensively on appeal, the government explicitly declined to address it. Appellee's Br. at 16, 24. Because we review *de novo* a district court's decision on a motion to dismiss, the government has waived any argument that the subgroups were not "established" by the FAA. *See Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1181 (D.C. Cir. 2011) ("Even appellees waive arguments by failing to brief them." (quoting *United States v. Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999))).

with subordinate Task Groups"), and exercised control over their membership selection, J.A. 104 (establishing criteria for who can serve on the DACSC); J.A. 72 (task group members must be chosen "in consultation with" the designated federal officer, who was either the head of the FAA or the second-in-command).[4] Nor does anyone dispute that the FAA created the subgroups for the express purpose of formulating advice on airspace policy. *See* J.A. 72 (providing that the subgroups are "established to *develop recommendations* and other documents for" the DAC) (emphasis added); J.A. 75 (providing that the "Task Groups will reach out to individual experts and other outside groups to *assist in developing UAS integration related recommendations*") (emphasis added); J.A. 102 (providing that "[t]he purpose of establishing [the DACSC] is to support the DAC *in developing consensus-based recommendations to the FAA* on issues related to the integration of UAS into the nation's airspace") (emphasis added).

Thus, the only question is whether the advice that the task groups and the DACSC provide is "for" the FAA, or instead is exclusively "for" the DAC. *See* 5 U.S.C. app. 2 § 3(2). Put another way, did the FAA establish the subgroups "in the

---

[4] Even assuming, *arguendo*, that the FAA did not "establish" the subgroups, EPIC has plausibly alleged that the FAA "utilized" them. *See Animal Legal Def. Fund, Inc. v. Shalala*, 104 F.3d 424, 429–30 (D.C. Cir. 1997) (explaining that a plaintiff can satisfy the "utilized" standard in two ways: (1) if the advisory body is "purely private," by showing that it is "so closely tied to an agency as to be amenable to strict management by agency officials," or (2) if the advisory body is "quasi-public," by showing that the Government "formed and funded it . . . for the explicit purpose of furnishing advice to the Government") (internal quotation marks omitted); *see also Food Chem. News v. Young*, 900 F.2d 328, 332 (D.C. Cir. 1990); *Washington Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1450 (D.C. Cir. 1994).

interest of" advising the FAA, or rather did the FAA establish them "in the interest of" advising the DAC, and only the DAC?

Not content with the text in its current form, the majority grafts onto the word "for" in section 3(2) the idea that a group must report "directly to" the agency to be treated as a FACA committee. Besides doing violence to the text, this approach elevates form over function. Here, common sense tells us that the subgroups' advice is developed with the end goal of assisting the FAA in designing its airspace policy. To say that the subgroups' advice is not "for" the agency because it's not delivered "directly to" the agency is a bit like saying that expert advice or recommendations given to a congressional committee is not "for" Congress as a whole, but rather exclusively for the benefit of that particular committee.

Although it is sometimes appropriate to deviate from plain statutory text when it is at odds with the statute's purpose, this is not a case "[w]here the literal reading of a statutory term would compel an odd result." *Pub. Citizen*, 491 U.S. at 454 (internal quotation marks omitted). To the contrary, FACA expressly contemplates that some "subcommittee[s]" or "task force[s]" will be deemed "advisory committee[s]." 5 U.S.C. app. 2 § 3(2). Nor are the subgroups "purely private group[s] . . . not formed by the" government. *See Pub. Citizen*, 491 U.S. at 460. Instead, these groups were formed and funded by the FAA, for the express purpose of providing advice for the benefit of the FAA. It seems entirely reasonable to require that they follow the same procedures as their parent committee.

But we need not rely solely on a common sense reading of the plain text, because our Circuit has already interpreted the word "for" in section 3(2). We explained in *California Forestry Association v. U.S. Forest Service* that this prong focuses not on how or to whom a group's advice is delivered,

but rather on whether the circumstances "support an inference that" the advice was "intended for [agency] use." 102 F.3d at 611–12. Nor did it matter that Congress, rather than the agency, was the "*primary* intended recipient" of the group's advice. *Id.* The group was nonetheless a FACA Committee, because it was established "in the interest of obtaining advice or recommendations for" the Forest Service and its work would "serve an essential element of the Forest Service's long-term plan for ecosystem management." *Id.* at 610–11 (quoting the district court's opinion). Here, as in *California Forestry*, the FAA may not be the "primary" intended recipient of the advice—the DAC is—but that fact doesn't resolve whether the advice is developed "for" the FAA under section 3(2) of FACA.

Instead, to determine whether a group or subgroup was established "in interest of obtaining advice or recommendations for" the government, we look to the intent behind the group's creation. In *California Forestry*, we concluded that a group was a FACA committee because its work "was intended for Forest Service use" and because the Forest Service "directed a large amount of discretionary funding to" the group. *Id.* at 610, 612. We also zeroed in on the word "for" in a Forest Service briefing paper submitted to Congress, which explained that the group was "part of [the Forest Service's] continuing effort to develop a strong ecosystem management program and ethic *for the Forest Service*." *Id.* at 611. It could not be said that the Forest Service's use of the group's work was "merely subsequent and optional." *Id.* at 613. Nor did we require in *California Forestry* that the group report "directly to" the Forest Service; instead, the group delivered its advice directly to Congress. *See id.* at 612 n.3 (noting that group's reports "shall . . . be submitted to" Congress).

The principle established in *California Forestry* is straightforward: If a group or subgroup is created by the government for the purpose of providing advice that is intended to benefit an agency, then its advice is obtained "for" the agency. *See* 5 U.S.C. app. 2 § 3(2). Based on the organic documents alone, that standard is met here. *See* J.A. 72, 75, 102.

To be sure, the question in *California Forestry* was whether the group's advice was "for" Congress or rather "for" an agency, which differs from the precise question here, which is whether the subgroups' advice is for the agency or exclusively for the nominal FACA committee. But the majority does not identify a reason that this distinction should make any difference. If anything, the case here is even stronger than in *California Forestry*, because the FAA itself (as opposed to Congress or another federal agency) created the subgroups, making it more likely that it intended for the subgroups' advice to benefit the FAA. The majority unreasonably siloes the "established" prong from the "in the interest of obtaining advice or recommendations for" prong, and, to boot, it applies a "directly to" gloss onto the latter. In doing so, it undermines FACA's purpose and greenlights an easily abusable system, whereby agencies may direct government-established subgroups to deliberate in complete secrecy, so long as the enabling documents require that the advice be filtered through a nominal FACA committee.

The structure of the subgroups further confirms that their advice is obtained "for" the FAA. The FAA exercised some level of control over virtually every aspect of the subgroups' existence, either through the enabling documents, which established the membership criteria and operating procedures, or through the DAC's "designated federal officer" ("DFO"), *see* 5 U.S.C. app. 2 § 10(e), who was either the FAA's Acting

Administrator or its Deputy Administrator. Significantly, the DFO maintains substantial control over the subgroups' proceedings and membership. J.A. 175 (providing that the DFO must "[c]all, attend, and adjourn all the committee/subcommittee meetings," and must approve the agendas of the DAC and its subgroups); J.A. 72 (task group members must be chosen "in consultation with" the DFO); J.A. 105 (providing for "[n]on-voting members" of the DACSC, who are "selected by the DFO" and "may attend as observers and have access to the committee's online workspace"). The DFO also assigns work to the task groups and controls the type of advice they may give. J.A. 53 ¶ 39 (alleging that the DFO issued "detailed tasking statements" for the task groups, which included "topics that each Task Group should advise on, and deadlines by which [they] should deliver [their] recommendations and reports").

Of course, the mere fact that a FACA committee's DFO is a high-ranking official of the agency that created the committee and its subgroups does not, by itself, render the subgroups FACA committees. But the FAA's decision to appoint such a high-ranking official as DFO is additional evidence that the FAA intended that the subgroups develop advice "for" the FAA.[5] Indeed, the FAA itself viewed the subgroups' purpose as formulating advice that would assist the FAA in developing airspace policy. In a press release, the FAA explained that the DAC would "conduct more detailed business through a

---

[5] I note as well that the government does not dispute that the DFO was an "officer[] of the Federal Government." 5 U.S.C. app. 2 § 3(2); Oral Arg. Recording at 18:40-18:55. Under my reading, a group established "in the interest of" advising an "officer[] of the Federal Government" may fall within the strictures of 5 U.S.C. app. 2 § 3(2). EPIC, however, does not argue that the subgroups' advice was intended "for" an "officer[] of the Federal Government," *see id.*, but rather "for" the FAA.

subcommittee and various task groups that will *help the FAA prioritize its activities, including the development of future regulations and policies*." J.A. 80 (emphasis added). It strains credulity to contend that a group that "help[ed] the FAA prioritize its activities" and "develop[] future regulations and policies" was not "serv[ing] an essential element" of the FAA's drone policy. *See California Forestry*, 102 F.3d at 610–11.

To justify its departure from *California Forestry*, the majority relies in part on a General Services Administration regulation, which states that "[i]n general, the requirements of [FACA] . . . do not apply to subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency." Maj. Op. at 8 (quoting 41 C.F.R. § 102-3.35(a)). *But see* 41 C.F.R. § 102-3.35(a) ("However, this section does not preclude an agency from applying any provision of the Act and this part to any subcommittee of an advisory committee in any particular instance."). But we owe no deference to "an agency's construction of a statute interpreted by more than one agency, . . . let alone one applicable to all agencies." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 913 (D.C. Cir. 1993). Therefore, "[f]or generic statutes like the APA, FOIA, and FACA, the broadly sprawling applicability undermines any basis for deference, and courts must therefore review interpretative questions de novo." *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003).

Even if deference were warranted, the GSA regulation expressly recognizes that FACA creates a "general" rule. 41 C.F.R. § 102-3.35(a). To the extent the majority reads § 102-3.35(a) as creating a categorical rule or precluding FACA's application to the subgroups merely because the agency doesn't view the subgroups as FACA committees, such an interpretation of FACA is unreasonable. FACA itself states

that some "subcommittee[s]" or "task force[s]" will be deemed "advisory committee[s]," so long as they were "established" or "utilized" by the government in the interest of providing advice "for" the government. 5 U.S.C. app. 2 § 3(2).

Put simply, because the FAA established the DACSC and the task groups and because their advice "was intended for [FAA] use" and to "serve[] an essential element" of the FAA's drone policy decisions, EPIC has plausibly alleged that the advice was obtained "for" the FAA under 5 U.S.C. app. 2 § 3(2). *See California Forestry*, 102 F.3d at 610–11.

In affirming the District Court, the majority relies heavily on *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv. Sector Surv. on Cost Control*, 557 F. Supp. 524, 526 (D.D.C.), *aff'd*, 711 F.2d 1071 (D.C. Cir. 1983). As here, *Anti-Hunger* concerned an allegation that a FACA committee's "task forces" were acting as advisory committees themselves. *Id.* at 529. The *Anti-Hunger* district court concluded that although the subgroups were "intimately involved in the gathering of information . . . and the formulation of possible recommendations for consideration of the Committee," they were not formed "in the interest of obtaining advice or recommendations *for*" the government under section 3(2), because they did not report "directly to" the government. *Id.* In addition, the district court concluded that the task forces were not acting as FACA committees because they were performing mere "staff functions," and there was "no reliable evidence that the[y] . . . ha[d] gone beyond such functions and ha[d] actually started advising agencies on policy recommendations." *Id.* at 529–30.

We affirmed the decision on appeal, but on narrow, evidentiary grounds. *Anti-Hunger*, 711 F.2d at 1075–76. Critically, we explained that the appellants argued the district

court's decision "ha[d] been called into question by new evidence suggesting both that task force reports [we]re [being] transmitted directly to federal decision makers before they [being] made publicly available," and that the FACA committee was "merely 'rubber stamping' the task forces' recommendations with little or no independent consideration." *Id*. We explained that "[e]ither of these facts, if true, might well have led the District Court to conclude that the task forces themselves were subject to the requirements of the FACA," but that on the record before it, the district court reasonably concluded that the task force reports "would be exhaustively reviewed and revised by" the FACA committee. *Id.* Because we were in "no position to weigh" the new evidence, we "recommend[ed] that the appellants seek appropriate relief from the District Court." *Id.* at 1076.

Accordingly, although we affirmed the *Anti-Hunger* district court's decision, "we did not explicitly approve the judge's reasoning relating to the supposed staff groups; rather, we rejected an effort to challenge his decision based on new information not in the record." *Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 912. To be sure, we said in *Anti-Hunger* that we "approve[d] the reasoning" of the district court. 711 F.2d at 1072. But we did not explain which part of the district court's reasoning we approved or why. Instead, the appellant argued that, even under the district court's "directness" test, new evidence revealed that they were entitled to relief. *Id.* Therefore, because the correctness of the district court's legal reasoning was not necessary to the decision in *Anti-Hunger*, any language purporting to "approve" the district court's reasoning is dicta. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 889 n.3 (1996) (discussion of questions "not at issue" is dicta).

14

Still, even assuming our decision in *Anti-Hunger* fully endorsed the district court's reasoning, *Anti-Hunger* differs from this case in three key respects.

First, unlike here, the task forces in *Anti-Hunger* were not established by the *government*—instead, they were created by a nonprofit corporation that contracted with the government to "provide assistance to the [FACA] Committee including facilities and staff support." 557 F. Supp. at 526 (noting that the nonprofit corporation "organized thirty-six task forces") (internal quotation marks omitted). Here, the fact that the FAA, as opposed to the DAC, created the subgroups makes it more likely that their advice is intended "for" the FAA rather than exclusively "for" the DAC. *See* 5 U.S.C. app. 2, § 3(2); *California Forestry*, 102 F.3d at 610–12.

Second, it does not appear the task forces in *Anti-Hunger* were even providing advice. Instead, they were organized as staffing groups. *Anti-Hunger*, 557 F. Supp. at 526 (explaining that the nonprofit would provide "facilities and staff support" and that the task forces would "do the 'preliminary work of the survey, including fact-gathering, statistical evaluations, and the formulation of preliminary reports'"); *see also* Exec. Order No. 12369, *President's Private Sector Survey on Cost Control in the Federal Gov't*, 47 Fed. Reg. 28,899 (June 30, 1982) (providing that the nonprofit organization could provide "staff support" to the Committee). Because there was "no reliable evidence that the task forces . . . ha[d] gone beyond such functions and . . . actually started advising agencies on policy recommendations," the district court rejected the contention that they were acting as FACA committees. 557 F. Supp. at 529–30 ("The depositions also suggest that the agency employees meeting with the task force members did not regard their discussions as advisory[.]").

That's a key distinction from this case, where the organic documents themselves *specifically require* the subgroups to develop advice. *See* J.A. 72 (providing that the subgroups are "established to develop recommendations"); *id.* at 75 (providing that the task groups will "assist in developing UAS integration related recommendations"). It is uncontested that the subgroups perform functions well beyond mere "fact-gathering, statistical evaluations, and the formulation of preliminary reports." *See Anti-Hunger*, 557 F. Supp. at 526. In fact, the government concedes that the DACSC and the task groups provide recommendations and advice. *See* Appellee's Br. at 24 (explaining that the DACSC and the task groups "provided advice" and "gave draft recommendations" to the DAC). This distinction matters, because the reasoning of *Anti-Hunger* hinged not only on the directness of the alleged advice, but also on whether the subgroups were providing "advice" at all.

Third, unlike *Anti-Hunger*, this case is in the pleading stage. The *Anti-Hunger* district court granted *summary judgment* because there was "no reliable evidence" that the task forces were offering advice or transmitting such advice directly to the President. *Id.* at 529. But this case hasn't reached the discovery phase, and the plaintiff's burden to defeat a motion to dismiss is modest. When reviewing a motion to dismiss, we must "assume the truth of all of plaintiffs' plausibly pleaded allegations[] and draw all reasonable inferences in their favor." *Agnew v. D.C.*, 920 F.3d 49, 53 (D.C. Cir. 2019). In *Anti-Hunger*, we suggested that where a subgroup is providing recommendations and a FACA committee is "rubber stamping" those recommendations "with little or no independent consideration," the subgroup might fall within FACA's coverage. 711 F.2d at 1075–76. Here, EPIC has made allegations that, if proved, could establish such a claim. *See id.*

EPIC's complaint alleges that "FAA officials have repeatedly circumvented the full DAC and worked directly with the Subcommittee." J.A. 51 ¶ 31. Specifically, EPIC asserts that "FAA officials have briefed and educated the DACSC, . . . provided guidance and assistance to the DAC[SC], . . . and personally participated in multiple DAC meetings at which the [DACSC] delivered reports on its work." J.A. 51 ¶ 32 (cleaned up). In this respect, the fact that a high-ranking FAA official presided over both the DAC's and the DACSC's meetings is important, because it makes it more plausible that the DAC was largely rubber-stamping the subgroups' recommendations, as the DFO has a great deal of control over both the DAC and the subgroups. *See* 5 U.S.C. app. 2 § 10(e); J.A. 72, 175.

In rejecting EPIC's "rubber stamping" allegations, neither the majority nor the District Court construed those allegations in the light most favorable to the plaintiff, as required by our precedent. *See Agnew*, 920 F.3d at 53. While some portions of the exhibits attached to EPIC's complaint indicate that the DAC deliberated over DACSC recommendations, *see* Maj. Op. at 11, other portions support an inference that the DACSC *was* advising the FAA—most notably, a statement at the May 3, 2017 meeting from the DACSC co-chair, who "indicated he is looking forward to giving actionable advice to the FAA." J.A. 132; *see also* J.A. 142–43 (noting that the "DAC Chairman . . . thanked the rest of the FAA executive team for their guidance and assistance to the DAC Subcommittee (DACSC)[.]"); J.A. 159 (noting that the DAC co-chair "thanked the FAA . . . for providing encouragement to the DACSC to bring the best thinking forward, including alternate views so the FAA gets the benefit of the best substantive thinking").

Even under the "directness" test proposed by the majority, these statements plausibly allege that the subgroups were

advisory committees to the FAA. We must assume the truth of these allegations. *See Agnew*, 920 F.3d at 53. Perhaps EPIC will ultimately fail to prove that the DAC was rubber-stamping the recommendations of the subgroups. But EPIC has plausibly alleged that the DAC was doing so, and at this stage, EPIC should thus be allowed discovery to find out one way or another.

Furthermore, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion," *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012), though the majority makes that choice here, *see* Maj. Op. at 11 n.2. "'Plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not. Indeed, the Court expressly distanced itself from the latter approach in *Iqbal*, 'the plausibility standard is not akin to a probability requirement.'" *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)).

Before concluding, I note that nothing about my reading of section 3(2) would treat every FACA committee subgroup as a standalone FACA committee. If the government wants to allow for subgroups to assist FACA committees without subjecting them to FACA, there are at least two ways for this to happen under the text. First, instead of the government establishing the subgroups, the FACA committees may, in their own discretion and free of government control, establish the subgroups themselves. In that case, the subgroups are free to provide advice or recommendations to the FACA committee, because they have not been "established" by the government. *See* 5 U.S.C. app. 2 § 3(2). Alternatively, the government may establish the subgroups, but require that they provide only

staffing work—such as "gathering information, developing work plans, [and] performing studies"—and prohibit them from providing "advice or recommendations." *Cf. Anti-Hunger*, 557 F. Supp. at 529.

We should look with suspicion upon agency efforts to circumvent FACA by using subgroups. *See Sofamor Danek Grp., Inc. v. Gaus*, 61 F.3d 929, 937–38 (D.C. Cir. 1995) ("[U]nlike Congress, a federal agency lacks power to exempt advisory committees from FACA and, hence, its motive in characterizing a committee's goal may, depending on the circumstances, be suspect."). Here, EPIC alleges in its complaint and exhibits incorporated thereto that the recommendations of the subgroups were largely developed in secret by multinational corporations with a direct financial interest in drone policy. But because the FAA drafted the enabling documents to require that the subgroups' advice be filtered through a nominal FACA committee, the majority prohibits EPIC from discovering the extent to which these allegedly self-interested members influenced the deliberations. Surely, that's not what Congress intended when it passed FACA. *See Pub. Citizen*, 491 U.S. at 459 ("FACA's principal purpose was to enhance the public accountability of advisory committees established by the Executive Branch[.]"); 5 U.S.C. app. 2 § 5(b)(3) (in establishing any new FACA committee, Congress must "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment").

In sum, though I concur with the majority that the "records" of a subgroup are not necessarily disclosable as the records of the parent committee under 5 U.S.C. app. 2 § 10(b), I respectfully dissent from its conclusion that EPIC failed to

plausibly allege that these particular subgroups were FACA committees in their own right.